2008 UT 18

**WESTERN WATER, LLC, a Utah limited liability company, Plaintiff and Appellant,**

v.

**Jerry D. OLDS, Utah State Engineer and Director of the Division of Water Rights, et al., Defendants and Appellees.**

No. 20060527.

Supreme Court of Utah.

Feb. 22, 2008.

Rehearing Denied April 9, 2008.

Terry L. Hutchinson, St. George, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Norman K. Johnson, Julie I. Valdes, Asst. Att'ys Gen., Salt Lake City, for defendants Olds and Utah State Eng'r.

Heather Shilton, Asst. Att'y Gen., Salt Lake City, for defendant Utah Div. of Parks & Recreation.

Martin B. Bushman, Asst. Att'y Gen., Salt Lake City, for defendant Div. of Wildlife Res.

Randy Hunter, Asst. Att'y Gen., Salt Lake City, for defendant Utah Dep't of Transp.

Stephen G. Schwendiman, Keli J. Beard, James P. Allen, Asst. Att'ys Gen., Salt Lake City, for defendant Utah Div. of Forestry, Fire & State Lands.

Steven E. Clyde, Edwin C. Barnes, Wendy B. Crowther, Salt Lake City, for defendant Cent. Utah Water Conservancy Dist.

David C. Wright, John H. Mabey, Jr., Salt Lake City, for defendants E. Jordan Irrigation Co., Kennecott Utah Copper Corp., Alpine City, Lehi City, Cedar Fort Irrigation Co., Lehi Spring Irrigation Co. and Pacifi-Corp.

Jody L. Williams, Steven J. Vuyovich, Salt Lake City, for defendants Irvine Ranch & Petroleum, Burnham Duck Club, E. Fred Walters, and Lower Jordan River Water Users Ass'n.

David B. Hartvigsen, Matthew E. Jensen, Salt Lake City, for defendants W. Glade Berry, Bart D. Berry, and Magna Water Co.

Kevin R. Bennett, American Fork, for defendant American Fork City.

Shawn E. Draney, Scott H. Martin, Salt Lake City, for defendants Cahoon & Maxfield Irrigation Co., Utah Lake Distrib. Co., Metro. Water Dist. of Salt Lake & Sandy, Salt Lake City Corp., Sandy City, and Provo River Water Users Ass'n.

Robert P. Hill, Allan T. Brinkerhoff, Reid E. Lewis, Salt Lake City, for defendant Jordan Valley Water Conservancy Dist.

Joro Walker, Sean Phelan, David H. Becker, Salt Lake City, for defendants Sierra Club, Trout Unlimited, Utah Waters, Utah Wetlands, and Nat'l Audubon Soc'y.

Michael M. Quealy, David Bird, Salt Lake City, for defendants Utah & Salt Lake Canal Co. and North Jordan Irrigation Co.

M. Dayle Jeffs, Provo, for defendant Clinger Family P'ship.

John P. Ashton, Salt Lake City, for defendant New State Inc.

David L. Church, Salt Lake City, for defendant Riverton City.

Richard G. Allen, Lehi, for defendant Saratoga Springs.

Ryan B. Carter, Roger F. Cutler, Jr., West Jordan, for defendant City of W. Jordan.

John H. Geilmann, South Jordan, for defendant S. Jordan City.

Glenn R. Maughan, Ogden, pro se.

PARRISH, Justice:

## INTRODUCTION

¶ 1 In 2001, Western Water LLC ("Western Water") submitted applications to appropriate water through a plan that would "salvage and exchange" water that was "spilling" into the Great Salt Lake from Utah Lake and the Jordan River. The appropriation request was massive. It covered 288,107 acre-feet of water per year in various alternative plans to satisfy the 86,000 acre-feet requested. After the State Engineer denied Western Water's applications in a memorandum decision, Western Water filed a request for reconsideration. The request for reconsideration presented a modified plan. The State Engineer took no action on the reconsideration request, resulting in a statutory denial after twenty days. *See* Utah Code Ann. § 63–46b–13(3)(b) (2004). Western Water then filed suit in the district court against the State Engineer and those who had protested its applications (collectively, "Defendants"), seeking de novo review of the State Engineer's denial of the modified plan. The district court dismissed Western Water's claim for lack of subject matter jurisdiction, finding that Western Water had failed to exhaust its administrative remedies. We affirm on appeal.

## BACKGROUND

¶ 2 This case begins with three related water appropriation applications filed by Western Water (collectively, the "Original Application") in 1999 and 2001. The Original Application contained a detailed plan for salvaging water "spilling" into the Great Salt Lake. The Original Application cumulatively

covered 288,107 acre-feet[1] of water per year from the Utah and Salt Lake valleys, although Western Water emphasizes that several appropriation requests were made in the alternative and that the actual amount of water requested was ultimately limited to 86,000 acre-feet of water per year.

¶ 3 To put the immensity of this request in perspective, 288,107 acre-feet would cover 450 square miles with one foot of water. This much water would cover an area the size of Utah Lake almost three times or fill Salt Lake City with almost four and a half feet of water. If all of this water were put to domestic use, it would provide enough water to meet the needs of 2,304,856 individuals for one year, just under the population of the entire state of Utah.

¶ 4 The parties disagree regarding the size of the appropriation requested in the Original Application. The description of the plan alone required a narrative 85 pages long, a 335–page "Statement of Facts," and 200 pages of exhibits. For this reason, the State Engineer characterized it as "gargantuan and complex" and "grandiose and highly speculative." Western Water disagreed with the State Engineer's characterization, arguing that the Original Application covered a "medium sized project," because some of the application requests were in the alternative. Western Water argued that although the application covered 288,107 acre-feet of water, it sought to appropriate only 86,000 acre-feet of water. Regardless of whether the proposed project was medium sized or grandiose, it is clear that the Original Application covered an immense amount of water.

¶ 5 The plan proposed by Western Water was also complex. It involved, among other things, extensive storage, diversion, and distribution facilities, including 65 miles of transmission pipelines, 10 pumping stations, 27 new or expanded diversion structures, 2 reservoirs, 127 recharge wells, and another 38 miles of pipes to facilitate underground storage. It also listed over 150 separate diversion points. Western Water's plan was to "develop a conservation and storage plan

that will allow for water that 'spills' into the Great Salt Lake to be salvaged and stored for new and more efficient uses in Utah and Salt Lake counties." The details of this plan are not important to our analysis.

¶ 6 The State Engineer advertised the Original Application pursuant to Utah Code section 73–3–6(1). Seventy-two protests were filed in response. Some of the protesters objected because Western Water anticipated using their property without permission. Many of the protesters claimed that the water in question was already fully appropriated and that the request could not be filled without impairing the rights of existing users. Others expressed concern that the application would harm water quality and quantity as well as the Great Salt Lake ecosystem, endangered species, migratory birds, wildlife, and wetland mitigation investments. Several municipalities protested that Western Water did not have permission to use the municipal facilities it described as part of its plan.

¶ 7 The State Engineer held a prehearing conference on November 15, 2001, to gather additional information, to clarify the project, and to substantiate the applications. An informal hearing was held on the Original Application in November 2002. Following the hearing, Western Water sent the State Engineer a letter supporting its application and suggesting that even if the entire application could not be approved under the statutory criteria, Western Water was entitled to have any smaller part of the application approved.

¶ 8 The State Engineer denied the Original Application after considering protests; basin management plans for Utah, Salt Lake, and Cedar valleys; relevant statutes; technical publications; and an additional statement of facts. The State Engineer justified his decision in a thoughtful memorandum, explaining that the Original Application failed to meet all of the requirements of Utah Code section 73–3–8. First, the State Engineer explained that "all of the waters within the Utah and Salt Lake valleys are fully appropriated by prior rights" and that the Original Applica-

---

1. An acre-foot is a volumetric measurement defined as the water that would cover one acre one foot deep. Utah Code Ann. § 73–1–2 (2004).

tion did not provide "adequate evidence or reason to believe that there is unappropriated water available for these applications." Second, because the Original Application requested water in an area that was fully appropriated, the State Engineer also concluded that "approval of these applications would impair existing rights or interfere with the more beneficial use of water." Third, without any evidence of contracts, permission, or support for gaining access to facilities, lands, or customers, the State Engineer found "no reason to believe the project as proposed is physically or economically feasible." Fourth, because of the lack of supporting evidence contained in the Original Application, the State Engineer concluded that Western Water had not provided "reason to believe that the applicants have the financial ability to complete the proposed project." Fifth, the State Engineer concluded that the Original Application was filed for speculation or monopoly because the only proposed beneficial use for the water was a plan to sell it to others. Indeed, the applicants had "no lands, facilities, customers, or contracts." Finally, the State Engineer concluded that the Original Application would "interfere with the beneficial use of prior appropriations," "adversely affect public recreation and the natural stream environment," and ultimately prove "detrimental to the public welfare."

¶ 9 Western Water timely filed a request for reconsideration, arguing that the State Engineer made "very important errors in law and facts." Rather than asking the State Engineer to reconsider the Original Application, however, Western Water asked that the State Engineer consider a "revised and reduced" version of the Original Application (the "Revised Application"). Arguing that the State Engineer or an applicant may "pare down" applications to avoid infirmities, Western Water requested that the State Engineer reconsider and approve the Revised Application "or any smaller project down to a single well." The State Engineer took no action on the Revised Application, thus denying it by default under Utah Code section 63–46b–13(3)(b).

¶ 10 Western Water filed suit against Defendants, seeking de novo judicial review of its Revised Application pursuant to Utah Code sections 63–46b–14 to –15. Arguing that the Revised Application should have been approved, Western Water claimed that the State Engineer made factual and legal errors, improperly applied statutory standards, and used criteria contrary to public policy. Western Water also argued that it was entitled to approval of any subset of the Revised Application that met the criteria of Utah Code section 73–3–8.

¶ 11 The district court dismissed Western Water's complaint on summary judgment for lack of subject matter jurisdiction. The district court concluded that the Revised Application was a "significant reformulation" of the Original Application. Because the State Engineer reviews requests for reconsideration only to see if they provide a reason to reconsider the original application, he reviewed Western Water's Revised Application only to see if it provided a reason to grant its Original Application. Thus, the State Engineer never considered the Revised Application independently and could review the Revised Application only in light of the Original Application. Accordingly, the district court held that there was no final agency action on the Revised Application and that Western Water had therefore failed to exhaust administrative remedies. The district court dismissed the case for lack of subject matter jurisdiction and awarded costs to Defendants.

¶ 12 In the course of motion practice prior to the summary judgment ruling, Western Water sought to prevent late-filing protesters and environmental protesters from remaining as parties to the de novo proceeding. It also attempted to limit the issues on which other interested parties could offer evidence. The district court held that all parties were entitled to introduce evidence to the extent that it was relevant, admissible, and not cumulative.

¶ 13 Western Water appeals these decisions. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(f).

## STANDARD OF REVIEW

¶ 14 We review the district court's summary judgment ruling for correctness, *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 15, 116 P.3d 271, and view all facts and reasonable inferences in favor of the nonmoving party. *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998). Because, by definition, summary judgments do not resolve factual issues, the conclusions of the district court are conclusions of law that we review for correctness. *See Bonham v. Morgan*, 788 P.2d 497, 499 (Utah 1989).

¶ 15 Jurisdictional questions are likewise legal issues that we review for correctness, affording no deference to the district court. *Beaver County v. Qwest, Inc.*, 2001 UT 81, ¶ 8, 31 P.3d 1147; *see also In re Uintah Basin*, 2006 UT 19, ¶ 7, 133 P.3d 410.

## ANALYSIS

¶ 16 We address three issues in this opinion. First, we review the district court's summary judgment order, affirming its conclusion that it lacked subject matter jurisdiction to consider the Revised Application because Western Water failed to exhaust its administrative remedies. Because we affirm the district court's conclusion regarding subject matter jurisdiction, we need not determine whether the protesters were appropriate parties to the proceeding and what kind of evidence they could present. Second, we affirm the district court's award of costs to Defendants. Third, because we specifically asked the parties to address the applicability and constitutionality of Utah Code section 73–3–15, we explain why we do not reach these issues.

## I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT IT LACKED SUBJECT MATTER JURISDICTION BECAUSE WESTERN WATER FAILED TO EXHAUST ITS ADMINISTRATIVE REMEDIES

¶ 17 "Subject matter jurisdiction is the authority and competency of the court to decide the case." *Salt Lake City v. Ohms*, 881 P.2d 844, 852 (Utah 1994) (emphasis and internal quotations omitted). District courts

have authority to review de novo any final agency action resulting from an informal administrative proceeding, including an action by the State Engineer. Utah Code Ann. § 73–3–14 (1989) (allowing any person "aggrieved" by an order of the State Engineer to obtain judicial review under sections 63–46b–1 through –23); *id.* § 63–46b–14(1) (2004) (allowing judicial review of final agency action); *id.* § 63–46b–15(1)(a) (granting district courts authority to review by trial de novo final agency actions resulting from informal adjudicative proceedings).

¶ 18 Authority for judicial review arises only after the parties have exhausted their administrative remedies unless an exception applies. *Id.* § 63–46b–14(2) ("A party may seek judicial review only after exhausting all administrative remedies available...."). "The basic purpose underlying the doctrine of exhaustion of administrative remedies is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Maverik Country Stores v. Indus. Comm'n*, 860 P.2d 944, 947 (Utah Ct.App.1993) (internal quotations omitted). The exhaustion requirement also ensures that the district court considers only "issues subject to determination by the [State] Engineer" because the effect of the court's judgment "is the same as it would have been if the Engineer had reached the same conclusion in the first instance." *United States v. District Court*, 121 Utah 1, 238 P.2d 1132, 1137 (1951).

¶ 19 In the context of water rights applications, administrative remedies cannot be exhausted if the applicant does not strictly comply with the statutory application process. *See* Utah Code Ann. § 73–3–1. The statute unequivocally states, "No appropriation of water may be made and no rights to the use thereof initiated and no notice of intent to appropriate shall be recognized except application for such appropriation first be made to the state engineer in the manner hereinafter provided, and not otherwise." *Id.* The statute also explains that rights to

unappropriated waters "may be acquired only as provided in this title." *Id.*

## A. The Application Process Is Strictly Prescribed by Statute

¶ 20 The application process for appropriating water can be conceptually divided into two steps—initiation and consideration. The appropriation process is initiated by filing an application with the State Engineer. Utah Code Ann. § 73–3–2(1) (Supp.2007). The application contains basic information about the applicant and the requested appropriation. *Id.* § 73–3–2(1) to -(2). On receiving a completed application, the State Engineer records the date on which he received it. *Id.* § 73–3–5(1). At this point, the State Engineer must "examine the application and determine whether any corrections, amendments or changes are required for clarity and if so, see that such changes are made before further processing." *Id.* § 73–3–5(2). If the application complies with the statutory requirements, it is filed and recorded. *Id.* § 73–3–5(3). So ends the initiation step.

¶ 21 Once an applicant has successfully initiated an application, the appropriation process moves into the consideration step as the State Engineer begins the process for making a decision on the application. The State Engineer must publish a notice of the application in a local newspaper. *Id.* § 73–3–6(1)(a). Following publication, only "clerical errors, ambiguities, and mistakes that do not prejudice the rights of others may be corrected" by the State Engineer. *Id.* § 73–3–6(1)(c). The purpose of publication is to allow "any person interested [to] file a protest with the state engineer." *Id.* § 73–3–7. The State Engineer considers these protests, among other statutory requirements, in deciding whether to approve or reject the application. *Id.* § 73–3–7(2); *id.* § 73–3–8 (outlining standards governing State Engineer's consideration of an application).

¶ 22 A party who fails to comply with the statutory requirements for initiating an application for appropriation, as set out by section 73–3–2, has failed to exhaust administrative remedies because the application has not been considered on the merits by the State Engineer and it has not been published

in order to notify potentially affected parties. *Cf. id.* § 73–3–8(1) (outlining factors necessary for the State Engineer to approve an application); *see also id.* § 73–3–6 (requiring publication of an application after it has been properly filed). This distinction between the initiation step and the consideration step is important in the context of a claim that an applicant has failed to exhaust administrative remedies because an application that has not been properly initiated, per statutory requirements, has not been considered by the State Engineer, and it would be inappropriate for a court to review de novo an application that the State Engineer has not even considered.

¶ 23 In this case, Western Water failed to exhaust its administrative remedies because the Revised Application did not comply with the statutory requirements for initiating an application. First, the Revised Application was sufficiently different from the Original Application that it constituted a new application. The State Engineer does not have authority to "reconsider" a new application. Second, the new application was submitted in an improper form.

## B. The Revised Application Was a New Application Because It Differed Dramatically from the Original Application

¶ 24 Western Water asserts that the Revised Application was not a new application because the modifications in the Revised Application were "*only* differences of deletion and subtraction." It is true that some changes are permitted without republication. For example, in *Whitmore v. Welch*, this court upheld the State Engineer's decision to allow a change in the point of return without requiring republication. 114 Utah 578, 201 P.2d 954, 959–60 (1949). The practical effect of the change in point of return reduced the applicant's request for water. We reasoned that because the change was a smaller subset of the original application, the initial publication gave notice as to any amount or distance included in the total. *Id.* at 960.

¶ 25 Comparing the alteration allowed in *Whitmore* to the alteration requested by Western Water demonstrates the factual gulf

between the two cases and illustrates why *Whitmore* is not controlling here. In *Whitmore*, the change discussed by the court moved the point of return 2000 feet up river so as not to impair other rights. In contrast, the Revised Application reduced Western Water's appropriation request by almost 30,-000 acre-feet (from 86,000 acre-feet to 56,880 acre-feet of beneficial use) and deleted pumping stations, wells, pipelines, diversions, and storage facilities, including the Cedar Valley Storage and Recovery System, which the Original Application defined as the "heart" of its plan. Under the Revised Application, the estimated cost changed from $100 million to $39.8 million. Finally, Western Water did not explain how these drastic reductions would change or affect the proposed uses to which the water would be put, perhaps because that would call attention to the fact that a change in purpose would require republication. *Cf.* Utah Code Ann. § 73-3-6(2) ("After publication ... the state engineer may authorize amendments or corrections that involve a change of point of diversion, place, or purpose of use of water, *only after* republication of notice to water users." (emphasis added)).

▮ ¶ 26 Accepting Western Water's argument that the Revised Application constituted a subset of the Original Application and was therefore appropriate for reconsideration without filing a new application would subvert the entire appropriation process. The Original Application was vast. Covering 288,107 acre-feet in various alternative plans, it requested water from virtually every source in the Salt Lake and Utah Valley watersheds. Almost any rational request would be a smaller subset of the Original Application. The Revised Application was not a specific request for water. It was a vague, amorphous suggestion that Western Water would take a lesser amount of water than was requested in the Original Application, "all the way down to a single well." In essence, the Revised Application asked the State Engineer to root around for unappropriated water and then award that water to Western Water. Such an approach does not fall within our jurisprudence favoring a liberal policy toward application approval. *See, e.g., Searle v. Milburn Irrigation Co.,* 2006

UT 16, ¶ 38, 133 P.3d 382 (explaining that a liberal policy toward application approval was mandated by the legislature because "the value of allowing experimentation cannot be understated"); *E. Bench Irrigation Co. v. State,* 5 Utah 2d 235, 300 P.2d 603, 605–06 (1956) (concluding that applications to appropriate water "must be approved if the [state] engineer finds reason to believe that some rights under such application may be acquired without impairing vested rights of others"). Holding otherwise would shift the burden of finding unappropriated water from the parties requesting appropriation to the State Engineer. *Cf. Searle,* 2006 UT 16, ¶ 49, 133 P.3d 382 (holding that in the context of a change application, the burden of persuasion remains on the applicant throughout the application process). While the law encourages experimentation and beneficial use, it does not encourage private parties to use the limited resources of the State Engineer to find unappropriated water for them under the guise of the State Engineer's duty to approve applications if they meet the requirements of section 73-3-8.

## C. The State Engineer Cannot "Reconsider" a New Application

▮▮ ¶ 27 As discussed above, there is only one way to appropriate water in Utah. Title 73, chapter 3 of the Utah Code "prescribes the exclusive manner" for initiating a right to use water and includes "the conditions upon which such right can be acquired[ ] and the procedural requirements which must be complied with." *Mosby Irrigation Co. v. Criddle,* 11 Utah 2d 41, 354 P.2d 848, 852 (1960) (citation omitted); Utah Code Ann. § 73-3-1 (1989) ("No appropriation of water may be made and no rights to the use thereof initiated and no notice of intent to appropriate shall be recognized except application for such appropriation first be made to the state engineer in the manner hereinafter provided, and not otherwise.").

▮ ¶ 28 The legislature established this strict procedural approach in order to "maintain order and efficiency in the appropriation, distribution and conservation of wa-

ter and to allow as much water to be benefi-cially used as possible." *United States v. District Court,* 121 Utah 1, 238 P.2d 1132, 1137 (1951). Similarly, the opportunity for public involvement by filing a protest ensures that "those who have an interest will bring to the agency's attention all relevant facts and considerations at the time the agency makes its decision." *S & G, Inc. v. Morgan,* 797 P.2d 1085, 1087 (Utah 1990) (internal quota-tions omitted). For these reasons, "develop-ment of water must require strict adherence to statutory sanctions, without delay or non-conformance thereto." *Baugh v. Criddle,* 19 Utah 2d 361, 431 P.2d 790, 791–92 (1967). In light of these precise procedural steps, it makes sense that a party cannot bypass the application process by presenting a new ap-plication disguised as a request for reconsid-eration.

¶ 29 A request for reconsideration is a narrow opportunity that allows a party to seek reconsideration of an order that would otherwise constitute final agency action by filing a written request for reconsideration "stating the specific grounds upon which re-lief is requested." Utah Code Ann. § 63–46b–13(1)(a). The agency may deny or grant the request in writing. *Id.* § 63–46b–13(3)(a). Alternatively, if the agency takes no action within twenty days, "the request for reconsideration shall be denied." *Id.* § 63–46b–13(3)(b).

¶ 30 In contrast to the complex steps for submitting an appropriation application, the reconsideration process is an optional, discrete step in the administrative process. The reconsideration request is optional ac-cording to the plain language of the statute. Section 63–46b–13(1)(b) states, "Unless oth-erwise provided by statute, the filing of the request [for reconsideration] is not a prereq-uisite for seeking judicial review of the or-der." Thus, the approval or denial of an appropriation application may constitute a final agency action if neither party requests reconsideration. *Maverik Country Stores v. Indus. Comm'n,* 860 P.2d 944, 951 n. 11 (Utah Ct.App.1993) (explaining that section 63–46b–13(1)(a) "provides a petitioner with the option of applying to the agency for reconsideration *or* appealing to the courts"

(emphasis added)); *see also Union Pac. R.R. v. State Tax Comm'n,* 2000 UT 40, ¶¶ 12–16, 999 P.2d 17 (finding that there may be vari-ous points of finality within an administrative process). The reconsideration request is also discrete as illustrated by the provision allow-ing statutory denial after only twenty days. This truncated time period illustrates that a reconsideration request is not a substitute for the appropriation process detailed in Utah Code sections 73–3–1 to –8. Consider-ation of a new application on a request for reconsideration would be tantamount to al-lowing a party to circumvent the clearly de-lineated statutory process required to obtain water appropriation rights.

¶ 31 There are limits to what the State Engineer can address on reconsidera-tion. First, the term itself dictates limita-tions. *Black's Law Dictionary* defines "re-consider" as a verb that means "to discuss or take up (a matter) *again.*" *Black's Law Dictionary* 1300 (8th ed.2004) (emphasis add-ed). Similarly, Webster's Dictionary defines reconsider to mean "to consider *again,* esp. with intent to modify an earlier decision." *Webster's II New Riverside University Dic-tionary* 983 (1984) (emphasis added). Obvi-ously, it is impossible to discuss a matter *again,* if it has never been discussed in the first place. Accordingly, it makes sense that a request for reconsideration is not the prop-er time to raise new arguments or new issues or to present new applications for appropria-tion. *See, e.g., Toledo, Peoria & W. Ry. v. Surface Transp. Bd.,* 462 F.3d 734, 753 (7th Cir.2006) (refusing to consider new evidence presented on a request for reconsideration because "if a party were free to reshape its case, so long as it did so within 20 days after a decision, the administrative process might never end" (citation and internal quotations omitted)); *see also Save Our Springs Alli-ance, Inc. v. Lazy Nine Mun. Util. Dist.,* 198 S.W.3d 300, 326 (Tex.App.2006) ("A motion for rehearing is an inappropriate time to raise new arguments."). The State Engineer cannot *reexamine* a claim he never consid-ered in the first instance. Thus, a new appli-cation cannot be considered on a request for reconsideration.

¶ 32 Second, the statute itself dictates limits as to what can be considered on a request for reconsideration. Section 73–3–6 explains that "[c]lerical errors, ambiguities, and mistakes that do not prejudice the rights of others may be corrected ... before or after publication of notice," but any alterations involving the "point of diversion, place or purpose of use of water" may be changed "*only* after republication of notice to water users." *Id.* § 73–3–6 (emphasis added). Requiring republication ensures that any party who may be affected by the altered application has an opportunity to file a protest. *See, e.g., S & G, Inc.,* 797 P.2d at 1087. This concept applies regardless of whether the application is altered before the State Engineer originally considers it or whether the application is altered as part of the request for reconsideration. Were we to allow substantial changes to an application on a request for reconsideration, parties whose rights may be affected by those changes would not be on notice of the need to file a protest, thereby subverting the appropriation process created by the legislature. We therefore hold that a party cannot substantively change an application during the reconsideration process.

¶ 33 Western Water's Revised Application involved several substantive changes requiring republication under section 73–3–6. Specifically, in the Salt Lake Valley, Western Water deleted several diversion points as well as all pumping stations and pipelines supporting its plan to exchange pump water to west-side Salt Lake Valley canals. In Utah and Cedar valleys, the Revised Application deleted diversions, recharge and recovery wells, and connecting pipelines.

¶ 34 The Revised Application also contains statements indicating that Western Water anticipates some additional changes following approval. For example, Western Water suggests that in Utah and Cedar valleys, the Revised Application would not store water in Utah Lake, but it may divert storage water "above or directly from the [L]ake or from the Jordan River." Similarly, the purpose of water requested in the Revised Application is uncertain. For example, in Utah and Cedar valleys, irrigation season flow in the convey-ance pipeline "may be delivered directly for outdoor irrigation use or may be recharged into the aquifer for conversion to drinking water supplies." Such equivocal statements regarding points of diversion and purposes of use do not comply with the republication requirements set out in section 73–3–6, indicating that such changes should not be accepted or considered during the reconsideration process.

¶ 35 Western Water argues that a request for reconsideration allows for changes to the Original Application because it continues the administrative process. While it may be true that the State Engineer has the authority to allow parties to alter their appropriation requests throughout the approval process, this authority is discretionary as illustrated by the use of "may" in both the statutory language and the administrative code. *See* Utah Code Ann. § 73–3–6 (providing that mistakes that do not prejudice the rights of others "*may* be corrected by order of the State Engineer" (emphasis added)); Utah Admin. Code r. 655–6–6(C) (2007) (stating that "[t]he Presiding Officer *may* allow pleadings to be amended or corrected," and other defects not affecting rights of others "*may* be disregarded" (emphasis added)). The discretionary nature of a request for reconsideration is further illustrated by the fact that the request will be statutorily denied if the State Engineer does not take any action for twenty days, Utah Code Ann. § 63–46b–13(3)(b), and by the fact that the request for reconsideration "is not a prerequisite for seeking judicial review," *id.* § 63–46b–13(1)(b). Because the authority to allow changes to an application during the administrative process is discretionary and the State Engineer is not obligated to accept those changes, Western Water's argument that the State Engineer had a duty to accept its amendments and hold a new hearing, if necessary, is simply at odds with the plain statutory language.

¶ 36 In conclusion, a party cannot bypass the application process by presenting a new application disguised as a request for reconsideration. First, the State Engineer can reconsider only an application that he has previously considered. Second, substan-

tive changes that would require republication under section 73–3–6 are inappropriate for the limited review provided during reconsideration. Third, the State Engineer has limited discretion to allow minor changes to an application during reconsideration, but this does not mean that the State Engineer has a duty to accept changes proposed during the reconsideration process.

### D. Alternatively, Western Water Did Not Exhaust Administrative Remedies Because the Revised Application Was a New Application That Was Submitted in an Improper Form

¶ 37 Alternatively, we hold that the State Engineer could not properly consider the Revised Application independent of the reconsideration process because it was a new application that was not properly submitted. The process for appropriating water is strictly prescribed by statute because of the premium the legislature has placed on efficient water allocation in this arid state. See Baugh v. Criddle, 19 Utah 2d 361, 431 P.2d 790, 791–92 (1967). First, an application for appropriation must be submitted to the State Engineer in the manner that he designates. Utah Code Ann. §§ 73–3–1 to –2 (Supp.2007). Among other things, the application must include

> the nature of the proposed use …; the quantity of water in acre-feet …; the time during which it is to be used each year; … [the] source from which the water is to be diverted; the place … where the water is to be diverted and the nature of the proposed diverting works; … [the] nature of the proposed diverting channel; and other facts that clearly define the full purpose of the proposed appropriation.

Id. § 73–3–2(1)(b)(ii)–(viii).

¶ 38 Western Water's Revised Application did not satisfy these statutory requirements because it was presented in an improper form and did not contain the information required by statute. As discussed above, the Revised Application was sufficiently different that it constituted a new application. However, it was not submitted "in a form prescribed by the state engineer" for new appli-

cations. Id. § 73–3–2(1)(a). In contrast, it was submitted as a request for reconsideration in a three-page narrative identifying the portions of the Original Application that had been deleted.

¶ 39 Moreover, the Revised Application did not clearly define the proposed purpose of the requested appropriation, as required by Utah Code section 73–3–2(1)(b)(ii). The paucity of definable purpose in the Revised Application is illustrated by the substantive changes it contained and the degree of flexibility it demonstrated. The Revised Application contained a plan for 56,888 acre-feet of water but requested approval of "any smaller part" of the plan, including "any smaller project down to a single well." Surely a single well could not serve the same purpose as a vast collection of water pipelines, storage areas, and recovery facilities. This example also illustrates Western Water's failure to state "the quantity of water in acre-feet … to be appropriated," id. § 73–3–2(1)(b)(iii), as well as its failure to state "other facts that clearly define the full purpose of the proposed appropriation," id. § 73–3–2(1)(b)(viii).

¶ 40 Finally, as discussed above, the Revised Application did not specifically define points of diversion, id. § 73–3–2(1)(b)(v)–(vi), or the dimensions, grade, shape, and nature of the proposed diverting channel, id. § 73–3–2(1)(b)(vii). Thus, even if the Revised Application were submitted as a new application, the State Engineer could not properly consider it because it does not satisfy the statutory requirements for initiating an application to appropriate water.

### II. THE DISTRICT COURT PROPERLY AWARDED COSTS PURSUANT TO ITS INHERENT JURISDICTION OVER ITS OWN PROCESS

¶ 41 We next consider the district court's order awarding costs to Defendants pursuant to rule 54(d)(1) of the Utah Rules of Civil Procedure. Western Water argues that if the district court lacked subject matter jurisdiction to hear the case, it likewise lacked authority to award costs. In support of this contention, Western Water cites this

court's decisions in *Wall v. Dodge*, 3 Utah 168, 2 P. 206 (1881), and *State ex rel. B.B.*, 2004 UT 39, 94 P.3d 252. We acknowledge the complexity of this issue but ultimately affirm the district court's award.[2]

¶ 42 District courts are courts of general jurisdiction. *See* Utah Const. art. VIII, §§ 1, 5; *Baker v. Dep't of Registration*, 78 Utah 424, 3 P.2d 1082, 1089 (1931). As such, they maintain jurisdiction to consider "all matters except as limited by" statute or constitution, according to article VIII, section 5 of the Utah Constitution. Under this broad jurisdictional grant, district courts maintain a certain degree of inherent power to properly discharge their duties. *See Barnard v. Wassermann*, 855 P.2d 243, 249 (Utah 1993) (citing *In re Evans*, 42 Utah 282, 130 P. 217, 224–25 (1913)). The inherent power of the district courts allows them to consider and make rulings on matters respecting their own jurisdiction, such as whether the substance of a claim may be reached, whether an issue is ripe for adjudication, or whether a party has standing. *See, e.g., Citizens for a Better Env't v. Steel Co.*, 230 F.3d 923, 926 (7th Cir.2000). Furthermore, a district court has inherent power "to make, modify, and enforce rules for the regulation of the business before [it], ... to recall and control its process, [and] to direct and control its officers, including attorneys and such." *In re Evans*, 130 P. at 224; *see Citizens*, 230 F.3d at 926 ("Courts that lack jurisdiction with respect to one kind of decision may have jurisdiction with respect to another.... A court ... always has jurisdiction to consider its own jurisdiction." (internal quotations omitted)). We accordingly hold that even though the district court lacked subject matter jurisdiction over the merits of Western Water's Revised Plan, it appropriately awarded costs pursuant to its inherent jurisdiction over its own processes.

¶ 43 This court's constitutional authority to "promulgate procedural and evidentiary rules" reinforces our view that district courts possess inherent jurisdiction over their internal processes. *Burns v. Boyden*, 2006 UT 14, ¶ 11, 133 P.3d 370; *see also* Utah Const. art. VIII, § 4 ("The Supreme Court shall adopt rules of procedure and evidence to be used in the courts of the state...."). And these procedural rules provide additional support for the award of costs in this case. The award of costs at issue was made under rule 54(d)(1) of the Utah Rules of Civil Procedure, which allows for costs "as of course to the prevailing party unless the court otherwise directs," except when express provisions in a statute or rule dictate differently. Admittedly, the concept of a "prevailing party" generally connotes a party that prevails on the merits of the underlying action. Practically speaking, however, a party's jurisdictional victory may be as significant as a win on the merits because it "materially change[s] the legal relationship" between the parties and typically comes with all of the attendant costs. *See, e.g., United States ex rel. Grynberg v. Praxair*, 389 F.3d 1038, 1057 (10th Cir.2004) (citing *Citizens*, 230 F.3d at 929–30). Furthermore, rule 54(d) does not exclusively limit cost awards to the "prevailing party." Rather, the district court maintains discretion to "otherwise direct[ ]" the allocation of costs. Utah R. Civ. P. 54(d)(1).

¶ 44 Western Water cites both *Wall*, 3 Utah 168, 2 P. 206, and *B.B.*, 2004 UT 39, 94 P.3d 252, for the assertion that cost awards are inappropriate when a court lacks subject matter jurisdiction over the underlying substantive matter. Both cases, however, are distinguishable.

¶ 45 In *Wall*, Utah's territorial Supreme Court stated that "a want of jurisdiction in the lower court," prevented that court from "properly render[ing] judgment for costs, there being no statute authorizing it." 2 P. at 207. The court's concern in *Wall*—that no statute authorized the award of costs—was alleviated by the subsequent adoption of both

---

2. We typically review a district court's decision to award costs under an abuse of discretion standard. *Jensen v. Sawyers*, 2005 UT 81, ¶ 140, 130 P.3d 325. Here, however, we are confronted with the legal question of whether a district court has jurisdiction pursuant to which it may exercise its discretion. We afford no deference to the district court's legal conclusions on appellate review and accordingly review this issue under a correctness standard. *Beaver County v. Qwest, Inc.*, 2001 UT 81, ¶ 8, 31 P.3d 1147.

the Utah Constitution and the Utah Rules of Civil Procedure. Thus, *Wall's* holding does not apply here.

¶ 46 The circumstances of *B.B.* also distinguish it from the present case because the holding in that case relied on the limited jurisdiction of juvenile courts and the lack of any statutory basis on which the parties could invoke jurisdiction. 2004 UT 39, ¶ 19, 94 P.3d 252. In that case, the Hardingers had visitation rights under a preadoption order, but those rights were not memorialized in the final adoption decree issued to a second couple, the Scotts. *Id.* ¶ 3. The Hardingers sought an order to show cause, requiring that the Scotts appear in juvenile court to explain why their violation of the preadoption visitation order did not constitute contempt. *Id.* The juvenile court asserted jurisdiction and ordered visitation pursuant to the preadoption visitation order. *Id.* The court of appeals reversed, finding that the juvenile court had no jurisdiction to hear the claim, and we agreed. *Id.* ¶¶ 4, 12. Focusing on the fact that juvenile courts have limited jurisdiction because they are creatures of statute, *id.* ¶ 19, we held that an adoption decree is a final order that alters the legal relationship between the parents, the child, and the court, *id.* ¶¶ 14–16. "[O]nce the legal relationship of parent and child is established, the juvenile court lacks subject matter jurisdiction over the adopted child until new requirements for jurisdiction are satisfied." *Id.* ¶ 17. By operation of statute, the adoption order terminated the jurisdiction of the juvenile court over the adopted child, *id.* ¶ 16; accordingly, the juvenile court lacked subject matter jurisdiction to hear the Hardingers' order to show cause; *id.* ¶ 13. Consistent with this analysis, we also held that the juvenile court lacked jurisdiction to award costs. *Id.* ¶ 19.

¶ 47 Our holding in *B.B.* is distinguishable from this case because *B.B.* relied on the limited jurisdiction of juvenile courts. District courts, in contrast, are courts of general jurisdiction, with inherent authority to oversee their own processes, even when the merits of a claim are dismissed for lack of subject matter jurisdiction.

¶ 48 In conclusion, as courts of general jurisdiction, district courts have inherent authority to oversee their own processes and to make procedural rules. This authority extends to an award of costs.

## III. WE NEED NOT ADDRESS THE CONSTITUTIONALITY OF THE DEADLINES IMPOSED BY UTAH CODE SECTION 73–3–15

¶ 49 In a letter dated January 22, 2007, counsel for Western Water alerted this court to Utah Code section 73–3–15, which states that final judgment on an informal adjudicative proceeding before the State Engineer must be entered within three years of the filing of the original complaint if the matter is appealed. Otherwise, the case will be subject to dismissal. Utah Code Ann. § 73–3–15 (1989). Therefore, on our own motion, we asked the parties to brief the constitutionality of section 73–3–15 out of our concern that its strict deadline for mandatory dismissal raised due process and separation of powers issues.

¶ 50 Although we laud the legislature's goal of encouraging the diligent prosecution of water rights, *id.* § 73–3–15(1), statutes mandating dismissal for failure to comply with strict deadlines potentially interfere with the judiciary's core power to "hear and determine justiciable controversies," *Salt Lake City v. Ohms,* 881 P.2d 844, 849 (Utah 1994). Attendant to this core function of adjudication is the ability of a court to set its own calendar and control its own docket. *See supra* ¶¶ 42–43; *cf. In re Steed,* 2006 UT 10, ¶ 6 n. 1, 131 P.3d 231 (disregarding a statutory provision that required the resolution of matters of judicial discipline within ninety days because the provision interfered with this court's internal processes). Statutes mandating strict deadlines for dismissal potentially interfere with this core function.

¶ 51 At the other end of the spectrum, these types of statutes may result in due process violations if parties' claims are dismissed because of court processes completely beyond their control. *See In re Marriage of Gonzalez,* 2000 UT 28, ¶ 24, 1 P.3d 1074; *Provo City v. Hansen,* 601 P.2d 141, 144 (Utah 1979) (Crockett, J., concurring). Our

concerns regarding section 73–3–15 arose because we could foresee this court being faced with the untenable choice between ensuring the due process rights of the parties and exercising our judicial functions without legislative interference.

¶ 52 Despite these concerns, we refrain from ruling on the constitutionality of the mandatory deadlines imposed in section 73–3–15 for two reasons. First, our concerns with respect to the statutorily mandated dismissal of this case are rendered moot because of our decision that the district court properly dismissed the case for lack of subject matter jurisdiction. Second, the dismissal mandated by section 73–3–15 is predicated on the filing of an application for dismissal by a party. In this case, no party has triggered the statute by moving for dismissal. We hope, however, that the articulation of these concerns may cause the legislature to reconsider the necessity of statutes that attempt to impose inflexible and sometimes unrealistic deadlines on the courts. In our view, the legislature's commendable goal of expediting litigation could be achieved on surer constitutional ground through the enactment of statutes that subject a party to dismissal of his claims due to his own lack of diligence, rather than on the timing of decisions by the courts over which the party may have no control. Alternatively, the legislature could recognize in such statutes the discretion of the courts to consider extenuating circumstances.

## CONCLUSION

¶ 53 We affirm the district court's dismissal of Western Water's complaint for lack of subject matter jurisdiction. Western Water's Revised Application differed so substantially from its Original Application that it must be considered a separate and new application. The State Engineer does not have authority to "reconsider" a new application, and the Revised Application could not be considered independent of the reconsideration process because it was not submitted according to the statutory requirements of Utah Code section 73–3–2. There was therefore no final agency action on the Revised Application. Given the lack of subject mat-

ter jurisdiction, we decline to consider whether the late-filing and environmental protesters are appropriate parties to the proceeding or the type of evidence that the protesters would be entitled to present. We affirm the district court's award of costs to Defendants, holding that the district court may award costs pursuant to its inherent jurisdiction over its internal processes. Finally, we decline to address the constitutionality of Utah Code section 73–3–15 but suggest that it would be prudent for the legislature to reconsider the wording of this and similar statutes so as not to jeopardize the due process rights of party litigants in the event of delays beyond their control.

¶ 54 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.