**2021 UT 20**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

In the matter of the adoption of C.C.,
a person under eighteen years of age.

J.S.P.,
*Appellant,*

*v.*

C.D.C. and M.L.S.,
*Appellees.*

No. 20190627
Heard February 10, 2021
Filed June 10, 2021

On Certification from the Court of Appeals

Fourth District, American Fork
The Honorable Roger W. Griffin
No. 172100011

Attorneys:

Benjamin B. Grindstaff, Salt Lake City, for appellant

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellees

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE,
and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 This is an appeal from the entry of a final order of
adoption. The adoption was challenged in the district court by the
child's putative father, J.S.P. J.S.P. sought to intervene on the
ground that he was the presumed father of the child (C.C.) under
Utah Code section 78B-15-204(1)(c), asserting he had entered into
an attempted marriage with C.C.'s mother prior to the child's
birth and the child had been born during that marriage. The
district court granted the motion to intervene but later dismissed

J.S.P. on a motion for partial summary judgment. In so doing, the court held that J.S.P. was not the presumed father because the marriage he had entered into with the birth mother (K.C.) was invalid given that K.C. was still married to another man on the date of the marriage to J.S.P.

¶2   J.S.P. made an initial attempt to appeal this decision (prior to the entry of the final adoption order) but abandoned the appeal after the court of appeals asked for briefing on whether the order dismissing J.S.P. was a final, appealable order. The adoption action then went forward in the district court, culminating in the entry of a final order of adoption.

¶3   J.S.P. then filed this appeal, asserting that the district court erred in dismissing him on partial summary judgment. The adoptive parents defend the district court's decision. They also challenge our jurisdiction, asserting that the decision dismissing J.S.P. on partial summary judgment was a final, appealable order and that the appeal from the final adoption order was accordingly untimely.

¶4   We conclude that the appeal was timely and hold that the district court erred in dismissing J.S.P. from the adoption action. The decision on partial summary judgment was not final and we accordingly have appellate jurisdiction. And the district court erred in dismissing J.S.P. because (a) the marriage between J.S.P. and K.C., while legally invalid, was entered into "in apparent compliance with law" under Utah Code section 78B-15-204(1)(c); and (b) the child was born "during the invalid marriage" and before that marriage was terminated by "death, annulment, declaration of invalidity, or divorce or after a decree of separation." *See* UTAH CODE § 78B-15-204(1)(c).

I

¶5   J.S.P. and K.C. sought to solemnize a marriage in New Hampshire in November 2013. They requested and received a marriage license, participated in a marriage ceremony, and received a certificate evidencing the "fact of the[ir] marriage." *See* N.H. REV. STAT. § 457:38 (stating that a marriage certificate is "evidence of the fact of" a marriage in New Hampshire).

¶6   The couple thereafter lived together in various states, went through some difficult times, and allegedly made several attempts to conceive a child. Many of the details are matters of dispute—and of no particular relevance to this appeal. But it is undisputed that K.C. became pregnant with J.S.P.'s child in late 2016, when the couple was again living in New Hampshire. Soon

thereafter, K.C. apparently told J.S.P. that she was leaving him and would be staying with family in Texas and Arizona. She left. And over the ensuing weeks, she also identified other locations where she planned to stay. Eventually she told J.S.P. that she was in Utah and would remain in Utah until the baby was born.

¶7   K.C. gave birth to C.C. on August 14, 2017, in Utah County. Two days later, K.C. signed a relinquishment of her parental rights and consent to placement of C.C. for adoption. The signed documents included sworn statements from K.C. attesting that she was unmarried but that J.S.P. was the potential father of the child—allegations made in light of K.C.'s knowledge that her 2013 marriage to J.S.P. had been entered into at a time when she was still married to another man. *See* N.H. REV. STAT. § 458:1 (providing that a marriage entered into by a person who has a former, living spouse is "absolutely void without any legal process" if the person knows that the former marriage has "not been legally dissolved").

¶8   The adoptive parents filed a petition for adoption in the district court on August 17, 2017. Thereafter, they also filed a motion for temporary custody and determination of parental rights. In connection with that motion, the adoptive parents submitted results of paternity searches from Utah and New Hampshire, demonstrating that no putative father had claimed paternity of the child before the mother relinquished her rights.

¶9   The district court entered an order of temporary custody and determination of parental rights on September 20, 2017. In so doing, the court determined that K.C. had relinquished her parental rights, concluded that no putative father had taken any steps to establish paternity in either Utah or New Hampshire, and held that the putative father was not entitled to receive notice nor required to consent to the adoption under Utah law.

¶10 Two days later, J.S.P. filed a petition for custody and paternity and notice of commencement of paternity proceedings in the district court. He also filed a verified petition for custody and paternity with the Utah Department of Vital Statistics. In these petitions, J.S.P. acknowledged that he and K.C. were not married but asserted that they "at one time maintained a romantic relationship from which [C.C.] was born."

¶11 The adoptive parents responded by filing a motion in the adoption action. Their motion asked the district court to confirm its determination of parental rights. The district court granted that

motion. It concluded that J.S.P. was an unmarried biological father who had failed to fulfill statutory prerequisites to his right to withhold consent to adoption.[1] And it accordingly held that the adoption could proceed without J.S.P.'s consent.

¶12 J.S.P. next filed a motion to intervene in the adoption proceeding. He claimed a right of intervention by statute—under Utah Code section 78B-15-204(1)(c). Citing this provision, J.S.P. asserted that he was the "presumed" father of C.C. because he had married K.C. "in apparent compliance with law" before C.C.'s birth and C.C. had been born "during the invalid marriage or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce or after a decree of separation." UTAH CODE § 78B-15-204(1)(c). On this basis, J.S.P. also asserted that his consent was required for the adoption of C.C. *See id.* § 78B-6-120(1) (providing that consent to adoption is required from a person "recognized as the father or mother of the proposed adoptee" under section 78B-15-204).

¶13 The district court granted the motion to intervene, opening the door to discovery on the question whether J.S.P. could ultimately qualify as a presumed father. Some of the discovery focused on the timing of J.S.P.'s knowledge that his marriage to K.C. had been bigamous (and thus invalid). The adoptive parents discovered tax filings from 2015 and 2016 and other documents executed as early as March 2014, suggesting that J.S.P. had considered himself to be single during that time frame. With those documents in hand, the adoptive parents filed a motion for partial summary judgment, asking the court to conclude as a matter of law that J.S.P. could not qualify as the presumed father under section 78B-15-204(1)(c).

¶14 The district court granted that motion. It noted that it was undisputed that the couple had sought to solemnize the 2013 marriage at a time when K.C.'s former marriage was still intact. And it held that the 2013 marriage accordingly was "absolutely void without any legal process" under New Hampshire law.

---

[1] *See* UTAH CODE §§ 78B-6-121(3), -122(1) (establishing that an unmarried biological father is entitled to notice of adoption and right to withhold consent for adoption only upon initiating a proceeding to establish his paternity of the child and submitting an affidavit setting forth plans for care of the child and agreeing to pay certain expenses).

Alternatively, the court concluded that the 2013 marriage "terminated" the day J.S.P. and K.C. entered into it—or at the latest once J.S.P. discovered that K.C.'s previous marriage was still intact (which, in the district court's view, was in November 2015 when K.C. learned that her divorce from her ex-husband had been finalized). Because J.S.P. could not qualify as the presumed father of C.C., the district court concluded that his consent to the adoption was not required and held that he was "not entitled to participate" in the proceedings and "must be dismissed with prejudice as a party."

¶15 J.S.P. filed a notice of appeal within 30 days of entry of the order dismissing him on summary judgment. No final adoption order had yet been entered, however, and the court of appeals thus issued an order asking the parties to brief the question whether the court had appellate jurisdiction. And J.S.P. abandoned his appeal after the adoptive parents submitted a brief asserting that the court lacked appellate jurisdiction because the decision on partial summary judgment was not a final, appealable order.

¶16 The adoption proceedings thereafter went forward in the district court. A final adoption order was entered in June 2019. And J.S.P. then filed a new notice of appeal, initiating the case that is before us today.

II

¶17 Two sets of questions are presented for our review. The first is raised by a challenge to our appellate jurisdiction. The second goes to the merits of the district court's determination that J.S.P. is not C.C.'s presumed father under Utah Code section 78B-15-204(1)(c). We conclude that we have jurisdiction and hold that the district court erred in its determination that J.S.P. is not the presumed father.

A

¶18 An appeal of right is available upon entry of a final judgment. UTAH R. APP. P. 3(a)(1). Such an appeal must be filed "within 30 days after the date of entry of the judgment or order" challenged by the appellant. *Id.* 4(a). The timing requirement is jurisdictional. If the notice of appeal is filed outside the 30-day period, the appellate court generally lacks jurisdiction. *See Christensen v. State Tax Comm'n*, 2020 UT 45, ¶ 33, 469 P.3d 962 (stating that "failure to file a timely notice of appeal prevents us from exercising jurisdiction. . . . subject to overrides or exceptions

set forth in our case law and in our rules of procedure" (citation and internal quotation marks omitted)).

¶19 The adoptive parents question the timeliness of the notice of appeal filed by J.S.P. here. They ask us to treat the decision dismissing J.S.P. on summary judgment as an order triggering an immediate appeal of right. And because J.S.P. abandoned the appeal he took from that order and waited to file a new notice of appeal until much later (after the subsequent entry of the final adoption order), the adoptive parents ask us to conclude that J.S.P.'s appeal was untimely and to hold that we thus lack appellate jurisdiction.

¶20 We decline this request. We conclude that J.S.P. had no appeal of right until the entry of the final adoption order. And we accordingly hold that the notice of appeal was timely because it was filed within 30 days of the entry of the final judgment.

¶21 An appeal of right is generally triggered only by the entry of a final judgment. And a final judgment is one that "adjudicates all claims and the rights and liabilities of all parties" to a proceeding. UTAH R. CIV. P. 54(a). The summary judgment order was not such a judgment. It conclusively held that J.S.P. did not qualify as a presumed father and that his consent was thus not required for the adoption. But that left other claims and rights to be resolved in the adoption action. The principal matter was not resolved until the adoptive parents' rights were established and the child's new status was finally decided in the final order of adoption. *W. Water, LLC v. Olds*, 2008 UT 18, ¶ 46, 184 P.3d 578 (explaining that "an adoption decree is a final order that alters the legal relationship between the parents, the child, and the court" (citing *State ex rel. B.B.*, 2004 UT 39, ¶¶ 14–16, 94 P.3d 252)). Until that order was entered, not all of the parties' claims, rights, and liabilities had been adjudicated.

¶22 The adoptive parents nonetheless ask us to treat the summary judgment order as an order triggering an immediate appeal of right. They note that some orders that are nonfinal in the above sense are nonetheless treated as doing so. And they ask us to analogize the order in question here to the kinds of orders treated as immediately appealable under our law.

¶23 We take the threshold point. "The general prohibition on interlocutory appeals is of course subject to exceptions." *Wash. Townhomes, LLC v. Wash. Cnty. Water Conservancy Dist.*, 2016 UT 43, ¶ 6, 388 P.3d 753. Some nonfinal orders may trigger an immediate appeal of right as "expressly authorized by statute." *Id.*

(citation and internal quotation marks omitted). Other such orders may give rise to an appeal under "our rules of procedure." *Id.* And our case law has also recognized at least one additional exception to the general rule: An order denying a motion to intervene has long been treated as immediately appealable. *See Millard Cnty. v. State Tax Comm'n ex rel. Intermountain Power Agency*, 823 P.2d 459, 461 (Utah 1991) (citing cases).

¶24 No such exception is available here, however. An order of parental termination may trigger an immediate appeal of right when entered in the juvenile court. *See* UTAH CODE § 78A-6-1109(2) (providing for an appeal of right from an order entered by the juvenile court in "abuse, neglect, dependency, termination, and adoption proceedings"); *C.M.F. v. State (State ex rel. A.F.)*, 2007 UT 69, ¶ 4, 167 P.3d 1070 (stating that such an order triggers an immediate appeal of right when it conclusively "effects a change in the status of the child"). But the cited statute applies only to orders entered in the juvenile court. And the district court order at issue did not effect a formal termination of parental rights in any event; it simply held that the adoptive parents had established as a matter of law that J.S.P. was not C.C.'s presumed father. A parental termination order was entered in the district court. But that did not happen until the entry of the final adoption order, in which the district court held that C.C.'s "natural parents" were "permanently deprived of all parental rights."

¶25 The order granting partial summary judgment was likewise not a denial of a motion to intervene. J.S.P.'s motion to intervene was granted by the district court. And once J.S.P. was allowed to participate as a party, he was on equal footing with all other parties. His subsequent dismissal thus could not produce a final, appealable order if the order dismissing him "adjudicate[d] fewer than all the claims or the rights and liabilities of fewer than all the parties." UTAH R. CIV. P. 54(b).

¶26 This is the settled rule under the counterpart provisions of the federal rules. An "intervenor, once allowed to become a party, is treated the same way as any other party." 15B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3914.18 (2d ed. 2020). For that reason, "[i]f intervention is allowed and the intervenor is thereafter dismissed, appeal is available only if final judgment is entered under Civil Rule 54(b)." *Id.*

¶27 This is consistent with our understanding of our Utah rules. Once J.S.P.'s motion to intervene was granted, he became a

full-fledged party to the proceeding in every respect. With that in mind, his subsequent dismissal from the action could not trigger an immediate appeal of right unless the decision was certified for immediate appeal under civil rule 54(b)—upon a determination that there had been a final adjudication of his rights and an express determination "that there [was] no just reason for delay." UTAH R. CIV. P. 54(b). Absent such certification and determination, an order that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties," *id.*, and is accordingly subject to challenge on appeal from entry of the eventual final judgment.

¶28 We uphold our appellate jurisdiction on this basis. We conclude that the summary judgment order adjudicating J.S.P.'s rights and dismissing him from the proceeding was not a final order and did not give rise to an immediate appeal of right. Because there was no certification of an appealable order under rule 54(b), the summary judgment order did not terminate the action and J.S.P. was free to await the entry of final judgment to pursue an appeal.

¶29 In so holding we are not suggesting that the course taken by J.S.P. was the only one available in these circumstances. One or more of the parties could have sought certification under rule 54(b). And with the benefit of hindsight, such a course may have been the better option in a case like this one. A 54(b) certification order could have foreclosed the disruption and delay that resulted from the decision to await a final judgment. And in future cases, such certification may well be appropriate where there is a perceived risk of delay or disruption of the establishment of a child's placement for adoption. *See* UTAH CODE § 78B-6-102(5)(a) (legislative finding that "the state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner, [and] in preventing the disruption of adoptive placements"); *id.* § 78B-6-102(5)(c) (stating that "adoptive children have a right to permanence and stability in adoptive placements").

B

¶30 By statute, a child under the age of 18 may be placed for adoption only upon consent of certain listed persons or after termination of certain persons' parental rights. *See* UTAH CODE § 78B-6-120. The list of persons whose consent is generally required includes a man who is recognized as the father of a child "by operation of law under Section 78B-15-204." *Id.* § 78B-6-

120(1)(b)(i). Section 78B-15-204(1)(c), in turn, provides that "[a] man is presumed to be the father of a child" if both of two conditions are met: (1) "before the birth of the child, he and the mother of the child married each other in apparent compliance with law, even if the attempted marriage is or could be declared invalid"; and (2) "the child is born during the invalid marriage or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce or after a decree of separation." *Id.* § 78B-15-204(1)(c).

¶31 The district court held that J.S.P. did not meet these requirements as a matter of law. First, it held that J.S.P. and K.C. had not married "in apparent compliance with law" because their marriage was "absolutely void without any legal process" under New Hampshire law. Second, it concluded that C.C. had not been born "within 300 days after" termination of the marriage because the marriage "terminated" on the day it was entered into or at the latest when K.C. (and presumably J.S.P.) learned that her divorce from her ex-husband had been finalized (in November 2015).

¶32 We review the district court's summary judgment decision *de novo*. *Bahr v. Imus*, 2011 UT 19, ¶ 16, 250 P.3d 56 (holding that we "review summary judgments for correctness, giving no deference to the trial court's decision"). And we reverse. First, we hold that the 2013 marriage was entered into in "apparent compliance with law" given that it was solemnized under an official marriage license and resulted in the issuance of a genuine certificate of marriage. Second, we conclude that the child was born within the required time frame—"during the invalid marriage or within 300 days after its termination" by one of the means prescribed by statute.

1

¶33 The marriage that J.S.P. and K.C. attempted to enter into in 2013 admittedly was invalid. Because K.C.'s marriage to another man was still intact at that time, the attempted marriage was a bigamous one. It is undisputed, moreover, that K.C. was aware of the fact that her former marriage was still intact. And that rendered the attempted marriage to J.S.P. invalid *ab initio*— "absolutely void without any legal process." *See* N.H. REV. STAT. § 458:1 (providing that a marriage entered into by a person who has a former, living spouse is "absolutely void without any legal process" if the person knows that the former marriage has "not been legally dissolved").

¶34 The district court granted the motion for summary judgment on this basis. But that was error. A presumed father's statutory status cannot be defeated by a determination that the marriage was invalid or void at the outset. That is clear from the plain language of the statute, which provides that presumed fatherhood arises from an "attempted marriage" in "apparent compliance with law"—"even if" such "attempted marriage is or could be declared invalid." UTAH CODE § 78B-15-204(1)(c).

¶35 Perhaps there is ambiguity in some of the statutory words when read in isolation. Sometimes *apparent* means "obvious" or "manifest." *Apparent*, BLACK'S LAW DICTIONARY (11th ed. 2019). And in that sense, the 2013 marriage was not in "apparent compliance with law." But we do not interpret statutory words in isolation. We read them in context. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (noting that "the statutory text may not be 'plain' when read in isolation, but may become so in light of its linguistic, structural, and statutory context"). And here the context forecloses the "obvious" or "manifest" sense of *apparent*. The statute is using *apparent* in the alternative sense of "ostensible" or "seeming." *Apparent*, BLACK'S LAW DICTIONARY (11th ed. 2019). That is clear from the above-noted fact that a presumed father's statutory status arises from an "attempted marriage" even if it "is or could be declared invalid."

¶36 An attempted marriage is thus in "apparent compliance" with the law where it is entered into in ostensible or seeming compliance with the law. That requirement is met where the would-be spouses apply for and receive a marriage license and procure an official certificate of marriage. *See* N.H. REV. STAT. § 457:38 (stating that a marriage certificate is "evidence of the fact of" a marriage in New Hampshire); UTAH ADMIN. CODE r. 162-2f-207(3)(a)(i)(A) (listing a marriage certificate as "official documentation" to be used when a person is reporting a name change for official licensing); *id.* 436-5-3 (allowing a father to be added to a child's birth certificate "if the natural parents submit a sworn acknowledgement of paternity, a certified copy of the marriage certificate and pay the required fee").

¶37 The adoptive parents assert that at least one (if not both) of the parties to the 2013 attempted marriage knew that it was not in "apparent compliance" with the law. And they ask us to affirm summary judgment in their favor on that basis.

¶38 We reject that request as incompatible with the governing statute. Admittedly, we can identify related provisions of law that

prescribe a requirement of knowledge or good faith belief of a spouse.[2] But this statute includes no such requirement. And we are in no position to graft one onto it. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012) (speaking of the "omitted case" canon—the principle that "[n]othing is to be added to what the text states or reasonably implies"); *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 21, 428 P.3d 1096 ("We will not infer substantive terms into the text [of a statute] that are not already there." (citation and internal quotation marks omitted)); *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 33, 301 P.3d 984 (emphasizing that we "resist the temptation to add language or meaning to [a statute] . . . where no hint of it exists in the text" (citation and internal quotation marks omitted)).

¶39 We reverse the first ground for the district court's summary judgment order on this basis. We hold that J.S.P. entered into an attempted marriage in apparent compliance with law by applying for and receiving a marriage license and procuring a certificate of marriage. And we conclude that J.S.P.'s status as presumed father is not defeated by the legal invalidity of the attempted marriage or by the fact that J.S.P. or K.C. may have been aware of the invalidity of the marriage.

---

[2] *See* UTAH CODE § 76-7-101(1) (stating that a person "is guilty of bigamy" only if they "know[] or reasonably should know" that they or their spouse "are legally married to another individual"); *id.* § 30-1-3 ("When a marriage is contracted *in good faith* and *in the belief* of the parties that a former spouse, then living and not legally divorced, is dead or legally divorced, the issue of such marriage born or begotten before notice of the mistake shall be the legitimate issue of both parties." (emphases added)); N.H. REV. STAT. § 639:1 ("A person is guilty of a class B felony if, having a spouse and *knowing* that he is not legally eligible to marry, he marries another." (emphasis added)); *id.* § 458:1 ("All marriages prohibited by law . . . where either [party] has a former wife or husband living, *knowing* such wife or husband to be alive and knowing that their marriage had not been legally dissolved, if solemnized in this state, shall be absolutely void without any legal process." (emphasis added)).

¶40 That leaves the question whether C.C. was born "during the invalid marriage or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce or after a decree of separation." UTAH CODE § 78B-15-204(1)(c). The district court found that this criterion was not met because the marriage was "terminated" on "the same day" it was entered into, or at the latest in November 2015 when K.C. (and presumably J.S.P.) learned that K.C.'s divorce from her former husband was finalized. But this, too, was error.

¶41 The statute draws a clear distinction between the invalidity of a marriage in the first instance and the mechanisms envisioned for its subsequent termination. A presumed father's status remains intact if the child is born "during the invalid marriage *or* within 300 days after its termination" by one of the mechanisms set forth by statute. *Id.* (emphasis added). And that makes it clear that the legal invalidity of a marriage alone is not a terminating event—or a basis for cutting off a presumed father's status.

¶42 C.C. was born "during" J.S.P.'s "invalid marriage" to K.C. That is clear from the fact that the marriage was not terminated by one of the mechanisms specified by statute—"by death, annulment, declaration of invalidity, or divorce or after a decree of separation." *Id.* Those are the only terminating events that could cut off J.S.P.'s presumed father status under section 78B-15-204(1)(c). And the absence of any of those terminating events reinforces the conclusion that C.C. was born "during" an "invalid marriage."

¶43 An invalid marriage is not "terminated" for purposes of section 78B-15-204(1)(c) just because it is legally void. Nor is it terminated, as the district court seemed to suggest, when the parties to an attempted marriage learn that it was void when initially entered into—as in this case, when K.C. (and presumably J.S.P.) learned that K.C.'s divorce from her former marriage had been entered in November 2015. Receipt of notice of the divorce may have given J.S.P. a clear basis for concluding that the 2013 marriage had been void *ab initio*. And it could have highlighted a potential basis for J.S.P. or K.C. to have initiated an action seeking a "declaration of invalidity"—a proceeding that could have cut off J.S.P.'s presumed father status for a child born 300 days or more after issuance of such declaration. *See id.* § 30-1-17.2. But notice of invalidity of the marriage or of a basis to seek to declare its

invalidity is not a basis for cutting off a presumed father's statutory status under section 78B-15-204(1)(c).

¶44 An action seeking a declaration of invalidity was not necessary to invalidate the 2013 marriage as a matter of New Hampshire law. *See* N.H. REV. STAT. § 458:1 (providing that a bigamous marriage is "absolutely void without any legal process"). But it is necessary as a matter of Utah law. Or at least it is a precondition to foreclosing J.S.P.'s statutory status as a presumed father under a statute that prescribes an exclusive list of means of termination of such status.[3]

¶45 J.S.P. was thus C.C.'s presumed father under section 78B-15-204(1)(c) because the child was born "during" J.S.P.'s "invalid marriage" to K.C. and before any events that would have terminated the marriage and started the clock on the statutory 300 days. We reverse the entry of summary judgment to the extent it rested on a contrary conclusion.

## III

¶46 We uphold our appellate jurisdiction and reverse the entry of summary judgment against J.S.P. And we reverse and remand to the district court for further proceedings consistent with our decision.

_____

[3] J.S.P.'s presumed father status would not give him a conclusive, perpetual claim of parental rights as to any children ever born to K.C. By statute, a presumed father's paternity is rebuttable in proceedings initiated under Utah Code section 78B-15-607.

Other states provide additional mechanisms for cutting off a presumed father's status, as by establishing that the status does not apply to a child born during a marriage that is "invalid without a court order" where the child is born 300 days or more after the parties cease "cohabitation." *See* N.H. REV. STAT. § 168–B:2(V)(b)(2) (providing for such a limitation). Our legislature is certainly free to consider amending our law to add such a provision. But it has not done so here (and such a provision would not aid these adoptive parents in any event, as it appears to be undisputed that K.C. and J.S.P. were cohabiting at the time of C.C.'s conception).

¶47 In so doing, we of course take no position on the appropriate disposition of the petition for adoption of C.C. or on any eventual question as to whether the child should be placed with J.S.P. We hold only that J.S.P. qualifies as a presumed father under Utah Code section 78B-15-204(1)(c) because he and C.C.'s mother entered into an attempted marriage in apparent compliance with law and the child was born during the invalid marriage.

––––––––––––