*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2025 UT 43**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

WATER HORSE RESOURCES, LLC,
*Appellant,*

*v.*

TERESA WILHELMSEN, in her official capacity as the
Utah State Engineer,
*Appellee*.*

No. 20240077
Heard April 7, 2025
Filed October 17, 2025

On Direct Appeal

Eighth District Court, Daggett County
The Honorable Gregory M. Lamb
No. 210800001

Attorneys*:

---

* Additional appellees: Utah Division of Water Resources, Utah
Board of Water Resources, Washington County Water
Conservancy District, Central Utah Water Conservancy District,
Wayne County Water Conservancy District, and Kane County
Water Conservancy District.

* Additional attorneys: John H. Mabey, Jr., David C. Wright,
Jonathan R. Schutz, Salt Lake City, for appellees Kane County
Water Conservancy District and Wayne County Water
Conservancy District; Steven E. Clyde, Edwin C. Barnes, Timothy
R. Pack, Salt Lake City, for appellee Central Utah Water
Conservancy District; Zack L. Winzler, Graham J. Gilbert, Salt Lake
City, for appellee Washington County Water Conservancy District;
Erin T. Middleton, Asst. Solic. Gen., Wendy Crowther, Asst. Att'y
Gen., Salt Lake City, for appellees Utah Board of Water Resources
and Utah Division of Water Resources.

Mark F. James, Salt Lake City, Glenn Porzak, Boulder, Colo., for appellant

Derek E. Brown, Att'y Gen., Sarah Shechter, Asst. Att'y Gen., Erin T. Middleton, Asst. Solic. Gen., Salt Lake City for appellee Teresa Wilhelmsen, Utah State Engineer

---

JUSTICE HAGEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, and JUSTICE POHLMAN joined.

---

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1    Beginning in the Rocky Mountains of central Colorado, the Colorado River flows over 1,400 miles through the arid American west towards a terminus in the Gulf of California. *Colorado River Basin*, U.S. BUREAU RECLAMATION, https://www.usbr.gov/ColoradoRiverBasin/(last updated Aug. 5, 2025). Along the way the river and its tributaries serve as a vital source of water to nearly forty million people. *See* KRISTEN HITE, CHARLES V. STERN & PERVAZE A. SHEIKH, CONG. RSCH. SERV., R45546, MANAGEMENT OF THE COLORADO RIVER: WATER ALLOCATIONS, DROUGHT, AND THE FEDERAL ROLE 1 (2025). For more than a century, allocation and management of the Colorado River System's water has been governed by a legal framework commonly referred to as the "Law of the River," which consists of a series of interstate compacts, international treaties, federal and state laws and regulations, and court decisions. *Id.* at 3–4. Among other things, the Law of the River apportions the water of the Colorado River System among the states of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming. *Id.* at 1, 3–7.

¶2    The Law of the River applies with equal force to the Colorado River's tributaries, including its principal tributary, the Green River. *See HEAL Utah v. Kane Cnty. Water Conservancy Dist.*, 2016 UT App 153, ¶ 13, 378 P.3d 1246 ("As the largest tributary of the Colorado River, the Green River is managed under numerous compacts, federal laws, court decisions, and regulatory guidelines, including the Colorado River Compact."). The headwaters of the Green River are located in western Wyoming and flow due south through the rugged mountain and desert terrain of eastern Utah

before the river's confluence with the Colorado River in Canyonlands National Park. *Id.* ¶ 11.

¶3    The parties seek resolution of a dispute under the terms of the Upper Colorado River Basin Compact (Upper Compact) and Utah's Appropriation and Export Statutes. Appellant Water Horse Resources, LLC (Water Horse) filed an application with the Utah state engineer to divert 55,000 acre-feet[1] of water from the Green River in Daggett County, Utah, to be piped across Wyoming and eventually put to beneficial use in Colorado. The state engineer rejected the application and later denied reconsideration. Water Horse sought de novo review of the state engineer's order by the district court.

¶4    The district court ultimately granted summary judgment in favor of the state engineer. The court ruled that the Upper Compact did not preclude application of Utah's water laws, and that Water Horse had subsequently failed to show that it complied with the relevant provisions of Utah's Appropriation and Export Statutes. The court also ruled in the alternative that the state of Colorado was a necessary and indispensable party that could not be joined and that the action should be dismissed under Utah Rule of Civil Procedure 19. Water Horse appealed.

¶5    We hold that Water Horse has not met its burden of persuasion to establish that the district court erred in granting summary judgment in favor of the state engineer. More specifically, we hold (1) that Utah's Export Statute does not conflict with the express terms of the Upper Compact and is therefore not preempted and (2) that Water Horse has failed to establish that there is "reason to believe" that the exported water can be put to beneficial use in Colorado. Consistent with these holdings, we affirm the judgment of the district court.[2]

---

[1] "An acre-foot is a volumetric measurement defined as the water that would cover one acre one foot deep." *W. Water, LLC v. Olds*, 2008 UT 18, ¶ 2 n.1, 184 P.3d 578 (citing UTAH CODE § 73-1-2 (2004)).

[2] Because we affirm the district court on the issue of beneficial use, we decline to reach the issues of whether Water Horse's application is speculative under Utah Code section 73-3-8, and whether the state of Colorado is a necessary and indispensable party under rule 19 of the Utah Rules of Civil Procedure.

## BACKGROUND

A. *The Colorado River Compact and the Upper Colorado River*
   *Basin Compact*

¶6   In 1921, Congress authorized the states of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming to enter into an interstate agreement to apportion and manage the water of the Colorado River System. *See* Act of Aug. 16, 1921, ch. 72, 42 Stat. 171. Following that authorization, the states signed the Colorado River Compact to "provide for the equitable division and apportionment of the use of the waters of the Colorado River System." COLORADO RIVER COMPACT art. I.[3] The Compact ultimately became effective upon ratification by Congress and the signatory states. *See* 43 U.S.C. §§ 617c(a), 617l(a); *see also* COLORADO RIVER COMPACT art. XI. The Colorado River Compact has become the cornerstone of the Law of the River and is to this day the main governing source of law regarding apportionment of the water of the Colorado River System. *See* KRISTEN HITE, CHARLES V. STERN & PERVAZE A. SHEIKH, CONG. RSCH. SERV., R45546, MANAGEMENT OF THE COLORADO RIVER: WATER ALLOCATIONS, DROUGHT, AND THE FEDERAL ROLE 3–4 (2025).

---

[3] The Colorado River Compact was ratified by Congress. *See* 43 U.S.C. § 617l(a). Likewise, Congress ratified the Upper Compact. *See* Act of Apr. 6, 1949, ch. 48, 63 Stat. 31. In ratifying the Colorado River Compact and the Upper Compact, Congress did not codify their text in the U.S. Code. But when Utah ratified these compacts, the legislature did codify their text at Utah Code section 73-12a-2 (Colorado River Compact) and section 73-13-10 (Upper Compact). To avoid confusion between the application of the interstate compacts and state statutes at issue in this case, we cite to the Colorado River Compact as "COLORADO RIVER COMPACT" and the Upper Colorado River Basin Compact as "UPPER COMPACT" with a corresponding reference to the applicable statutory provision.



*Colorado River Story*, UTAH DEP'T NAT. RES., https://water.utah.gov/interstate-streams/colorado-river-story/(last visited Sept. 18, 2025).

¶7    The Colorado River Compact divides the Colorado River drainage basin into the upper and lower basins. *See* COLORADO RIVER COMPACT art. III(a). The upper basin primarily consists of the states of Colorado, New Mexico, Utah, and Wyoming, while the lower basin primarily consists of the states of Arizona, California, and Nevada. *Id.* art. II(c)–(d). The Colorado River Compact apportions "to the Upper Basin and to the Lower Basin, respectively, the exclusive beneficial consumptive use of 7,500,000 acre-feet of water per annum." *Id.* art. III(a). But the Colorado River Compact does not address specific allocations to the signatory states. Nor does it address or provide for cross-border water diversions (i.e. diverting water from a water source in one state for beneficial use in another).

¶8    After Congress ratified the Colorado River Compact, it authorized the signatory states "to negotiate and enter into compacts or agreements, supplemental to and in conformity with the Colorado River compact." 43 U.S.C. § 617r. In 1948, the upper basin states signed the Upper Compact. The states entered the Upper Compact to manage and allocate the upper basin apportionment and to ensure compliance with obligations to the lower basin states outlined in the Colorado River Compact. *See* UPPER COMPACT art. I (Oct. 11, 1948). The Upper Compact became effective upon the ratification by the signatory states and Congress.

*See* Act of Apr. 6, 1949, ch. 48, 63 Stat. 31; *see also* UPPER COMPACT art. XXI. Under the terms of the Upper Compact, each of the signatory states receives a percentage-based portion of the upper basin allotment. UPPER COMPACT art. III(a). And article IX(a) of the Upper Compact contemplates cross-border water diversions, stating, in relevant part:

> [N]o State shall deny the right of another signatory State, any person, or entity of any signatory State to acquire rights to the use of water . . . or regulating water in an upper signatory State for consumptive use in a lower signatory State, when such use is within the apportionment to such lower State made by this Compact.

*Id.* art. IX(a).

¶9    The Upper Compact parrots in part the purposes of the Colorado River Compact, which are "to provide for the equitable division and apportionment of the use of the waters of the Colorado River System" and "to promote interstate comity." *Id.* art. I(a). The Upper Compact also provides that the apportionment of water is based on various principles including that "[b]eneficial use is the basis, the measure and the limit of the right to use." *Id.* art. III(b)(2). The Upper Compact additionally created an interstate agency known as the "Upper Colorado River Commission" to perform various functions and duties as outlined in the Upper Compact. *See generally id.* art. VIII. But otherwise, the Upper Compact's provisions "shall not apply to or interfere with the right or power of any signatory State to regulate within its boundaries the appropriation, use and control of water, the consumptive use of which is apportioned and available to such State by this Compact." *Id.* art. XV(b).

### B.   Utah's Water Appropriation Laws and Procedures

¶10   In Utah "[a]ll waters in th[e] state" are "the property of the public." UTAH CODE § 73-1-1(1). Recognizing that Utah "is one of the most arid states in the nation" and that Utah has a need to "ensure [its] finite water resources are used beneficially," *id.* § 73-1-21(1)(a), the legislature has declared that "[b]eneficial use shall be the basis, the measure and the limit of all rights to the use of water in th[e] state," *id.* § 73-1-3.

¶11 Consistent with this declaration, the legislature has enacted various statutes regarding water and irrigation to manage

the state's scarce water resources. *See generally id.* §§ 73-1-1 to 73-33-203. To oversee and administer water rights, the legislature created the Division of Water Rights within the Utah Department of Natural Resources, *id.* § 73-2-1.1, and provided that the Division "be administered by the state engineer who shall act as the director of the Division," *id.* § 73-2-1.2. The state engineer is "responsible for the general administrative supervision of the waters of the state and the measurement, appropriation, apportionment, and distribution of those waters." *Id.* § 73-2-1(3)(a).

¶12 A party seeking to appropriate water must apply to the state engineer to acquire a right to the unappropriated water. *See id.* §§ 73-3-1 to -2. The process and application requirements for appropriating water are laid out in Utah Code sections 73-3-1 to -32 (Appropriation Statute). Upon receiving an appropriation application, the state engineer reviews the application, issues a public notice, receives any protests, and in most cases holds an informal administrative hearing. *See id.* §§ 73-3-5 to -7; UTAH ADMIN. CODE R655-6-7. The state engineer ultimately approves or rejects the application based upon whether the application meets the statutory requirements. *See, e.g.,* UTAH CODE § 73-3a-108. Relevant here, the state engineer can approve an application only where the appropriation would be "for a useful and beneficial purpose." *Id.* § 73-3-1(4).

¶13 Utah also "recognizes that under certain conditions the transportation of water for use outside the state may not be contrary to: (a) the conservation of Utah's waters; or (b) the public welfare." *Id.* § 73-3a-101(3). Accordingly, the legislature has adopted a statutory scheme establishing an administrative procedure for approving export of water to another state. *See id.* §§ 73-3a-101 to -109 (Export Statute).

¶14 The state engineer follows the same administrative process for considering export applications as it does for appropriation applications. *See id.* § 73-3a-105. As relevant here, the Export Statute requires the applicant to show that "the water can be transported, measured, delivered, and beneficially used in the recipient state." *Id.* § 73-3a-108(1)(b)(ii). If the applicant "fails to meet any criteria" of subsection 73-3a-108(1) of the Export Statute, then the state engineer must reject the application. *Id.* § 73-3a-108(3).

¶15 Approval does not end the process for the applicant. Rather, upon approval, the applicant proceeds with perfecting the proposed appropriation by putting it to beneficial use, as well as

following the other procedural requirements laid out in the Appropriation Statute. *See generally id.* §§ 73-3-10, -16, -17.

¶16 Rejection is likewise not the end of the road. The applicant may request the state engineer reconsider the original order. *See* UTAH CODE § 63G-4-302(1)(a). If that proves similarly unsuccessful then the aggrieved party "may obtain judicial review in accordance with Title 63G, Chapter 4, Administrative Procedures Act." UTAH CODE § 73–3–14(1)(a). The district court reviews the informal administrative proceeding of the state engineer de novo. *See W. Water, LLC v. Olds*, 2008 UT 18, ¶ 17, 184 P.3d 578; UTAH CODE § 63G-4-402(1)(a). In doing so, the district court "is not sitting in its capacity as an adjudicator of rights, but is merely charged with ensuring that the state engineer correctly performed an administrative task." *Searle v. Milburn Irrigation Co.*, 2006 UT 16, ¶ 35, 133 P.3d 382. The district court therefore may consider only those issues "subject to determination by the State Engineer because the effect of the court's judgment is the same as it would have been if the Engineer had reached the same conclusion in the first instance." *W. Water*, 2008 UT 18, ¶ 18 (cleaned up).

C. *Water Horse's Application to the State Engineer*

¶17 In January 2018, Water Horse filed an export application with the Utah state engineer.[4] The application sought to appropriate and export to Colorado 55,000 acre-feet of water annually from two points of diversion on the Green River in Daggett County.

---

[4] On appeal we review the decision of the district court, not that of the state engineer. We provide a recitation of the proceedings before the state engineer for background purposes only.



*Attachment to Water Horse's Application to Appropriate Water, January 12, 2018*

¶18  Water Horse proposed that it would pipe the water across Wyoming, using a to-be-constructed pipeline following the path of an existing "federal energy corridor" along Interstate 80. Water Horse had not established a final delivery location, but proposed Cobb Lake near Fort Collins, Colorado. Once Water Horse diverted the water from its natural course and artificially pumped it over 300 miles, it proposed to put the water to beneficial use along Colorado's Front Range Corridor.[5] In its application, Water Horse claimed that the water would "constitute[] a withdrawal under the allocation apportioned to the state of Colorado under the 1922 Colorado River Compact and the 1948 Upper Colorado River Basin Compact." Water Horse also represented to the state engineer that Water Horse would demonstrate "that the application complies with the requirements of [Utah's Export Statute]."

---

[5] Colorado's Front Range Corridor refers to an area along the eastern edge of the Rocky Mountains and the Continental Divide. It includes major Colorado cities such as Fort Collins, Boulder, Denver, Colorado Springs, and Pueblo.

¶19 The state engineer published the application pursuant to Utah Code subsections 73-3-6(1) and 73-3a-107(1) and subsequently received two letters of support and numerous protests opposing Water Horse's application. The state engineer conducted an informal administrative hearing in November 2018 where Water Horse and various protesting parties presented testimony and documents in support of and in opposition to the application. After the informal hearing, Water Horse, as well as some of the protesting parties, provided supplemental information to the state engineer at various times in 2019 and 2020 as the state engineer conducted and finalized her investigation.

¶20 While the application was pending, the director of the Utah Division of Water Resources—a separate division within the Department of Natural Resources—received a letter regarding Water Horse's export application from the Commissioner from Colorado for the Upper Colorado River Commission and the Director of the Colorado River Conservation Board. In the letter, the Colorado officials stated that "[b]ecause use of the subject water is projected to occur in Colorado, the applicant also must comply *with relevant laws and procedures for water rights administration in Colorado*." (Emphasis added). They also stated that "[o]nly the State of Colorado, pursuant to its state sovereignty and the Upper Colorado River Commission (UCRC) pursuant to the Upper Colorado River Basin Compact have authority to make determinations as to Colorado's compact apportionments." The officials explained that "[i]n order to place any water to beneficial use in Colorado, water users must comply with [the Colorado Water Rights Determination Act] to ensure that water is appropriated pursuant to a decree that can be administered in accordance with state water laws, rules and regulations." Lastly, they represented that "Colorado maintains that water from the Upper Colorado River Basin shall not be considered or accounted for as part of Colorado's compact apportionment unless and until *proceedings for placing water to beneficial use in Colorado have been followed and completed*." (Emphasis added.) The state engineer reviewed the letter as part of her investigation and cited the letter in her order rejecting Water Horse's application.

¶21 The state engineer rejected the application in an order issued on November 17, 2020. The order addressed the criteria required for approval under the Export Statute and concluded that they were not met. In the order, the state engineer relied on our decision in *Searle*, 2006 UT 16, and applied the "reason to believe"

standard of proof to Water Horse's application. The state engineer concluded that she did "not have reason to believe this application constitutes a viable request under article IX" of the Upper Compact because "the application lack[ed] an unambiguous guarantee from a state signatory to the Colorado River compacts that depletion of water diverted and used under th[e] application [would] be accounted for from a signatory state's Colorado River allocation."

¶22   Water Horse timely requested reconsideration under Utah Code section 63G-4-302. Water Horse requested that Colorado's state engineer support its reconsideration request by signing a proposed letter to Utah's state engineer drafted by Water Horse's counsel. The proposed letter purported to "clarify [Colorado's] position regarding development of a portion of Colorado's remaining allocation of Colorado River water" and to respond to the Utah state engineer's concerns regarding guarantees from an Upper Compact signatory state to account for the water as part of its Upper Compact allocation.

¶23   The Colorado state engineer declined to sign the proposed letter. Instead, he reiterated in email communications with Water Horse that "Colorado is unable to consider the diversion of any water as part of its Compact allocation without clear authority to administer that diversion." He also clarified that "any required proceedings for placing water to beneficial use in Colorado will likely depend on the detailed plans for the delivery of water for specific beneficial uses." He was "unable to sign the letter" until "Water Horse complete[d] a proceeding in Colorado confirming a water right for the claimed beneficial use" that would "provide additional information regarding the nature of the appropriation to the [Colorado] State Engineer's Office as to beneficial use and accounting for such depletion as part of Colorado's apportionment."

¶24 The Utah state engineer took no action on the reconsideration request, thereby denying it by default. *See* UTAH CODE § 63G-4-302(3)(b). Water Horse then sought judicial review as provided for in Utah Code sections 63G-4-401 and 73-3-14.

*D.  Proceedings in the District Court*

¶25 Water Horse filed its petition for review on January 26, 2021, naming the Utah state engineer as the respondent. The Utah Board of Water Resources, the Utah Division of Water Resources, the Kane County Water Conservancy District, the Wayne County Water Conservancy District, the Central Utah Water Conservancy

District, and the Washington County Water Conservancy District intervened.[6] *See* UTAH CODE § 73-3-14(3)(b)(ii); UTAH R. CIV. P. 24. Water Horse moved for summary judgment, and the state engineer opposed Water Horse's motion and cross-moved for summary judgment.

¶26 After a hearing, the district court denied Water Horse's motion and granted summary judgment in favor of the state engineer. In its written ruling, the court articulated the following undisputed facts that are particularly relevant to this appeal:

- "To date, Water Horse has not filed an application or action of any kind with any Colorado agency or water court for approval of its proposed appropriation."

- "Water Horse has not obtained any approvals from Colorado for the proposed appropriation or Project."

- "Water Horse has not asked the Upper Colorado [River] Commission or the State of Colorado that the appropriation be counted against Colorado's Upper Compact allocation."

- "The State of Colorado and Upper Colorado River Commission have not agreed to account for depletions from the Project under Colorado's Colorado River allocation."

These undisputed facts were based on communications from Colorado officials that were submitted to Utah's state engineer while the initial application was under review and as part of Water Horse's request for reconsideration.

¶27 Based in part on the undisputed facts, the district court ruled that: (1) the Upper Compact did not preclude application of Utah's water laws and article IX(a) of the Upper Compact did not grant Water Horse an unambiguous right to demand a cross-border water diversion; (2) Water Horse "failed to offer material facts which establish the statutory requirement[]" of showing beneficial use under Utah's Export Statute; and (3) Water Horse's application was speculative under Utah Code subsection 73-3-8(1)(a)(v). As an alternative ground for granting summary judgment for the state engineer, the district court ruled that under rule 19 of the Utah

---

[6] On appeal, the intervening parties have joined the Utah state engineer's argument and briefing. For convenience we refer to the state engineer and the intervening parties collectively as the "state engineer."

Rules of Civil Procedure, the State of Colorado was a necessary and indispensable party that could not be joined.

¶28 Water Horse timely filed a notice of appeal. We have appellate jurisdiction to review a district court's decision reviewing an informal adjudicative proceeding before the state engineer. UTAH CODE § 78A-3-102(3)(f).

## STANDARD OF REVIEW

¶29 "We review the district court's summary judgment ruling for correctness, and view all facts and reasonable inferences in favor of the nonmoving party." *W. Water, LLC v. Olds*, 2008 UT 18, ¶ 14, 184 P.3d 578 (cleaned up). In reviewing the district court's grant of summary judgment in this case, we are tasked with interpreting provisions of the Upper Compact and Utah's Appropriation and Export Statutes. Interstate compacts are construed as contracts and are governed by principles of contract law. *See Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 628 (2013). The interpretation of a contract is a question of law reviewed for correctness. *Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 19, 258 P.3d 539. Interpretation of a statute is also a legal question reviewed for correctness. *See Harvey v. Cedar Hills City*, 2010 UT 12, ¶ 10, 227 P.3d 256.

## ANALYSIS

I.   THE UPPER COMPACT DOES NOT PREEMPT UTAH'S EXPORT STATUTE

¶30 We begin our analysis by addressing Water Horse's argument that the Upper Compact preempts the application of Utah's Export Statute. In support of this proposition, Water Horse cites to the language of article IX(a) of the Upper Compact, which states, in relevant part, that "no State shall deny the right of another signatory State, any person, or entity of any signatory State to acquire rights to the use of water . . . when such use is within the apportionment to such lower State." UPPER COMPACT art. IX(a). Water Horse contends that this language is "unequivocal" and that Utah cannot deny Water Horse, an entity of the state of Colorado, "the right to acquire the rights to divert and beneficially use water that is part of Colorado's remaining share of its allotment under the Upper Basin Compact." Under Water Horse's reading of article IX(a), the district court erred in applying Utah's Export Statute because a provision of a congressionally approved compact "preempts any conflicting state law."

¶31 The state engineer agrees that "[t]he Upper Compact is 'contractual' and 'a federal statute' and 'preempts contrary state law.'" (Quoting *Texas v. New Mexico*, 602 U.S. 943, 949–50 (2024).) But she argues that Utah's Export Statute does not conflict with the Upper Compact. We agree.

¶32 A federal law can preempt a state statute by an express statement or by implication. *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 76–77 (2008). Express preemption occurs when there is explicit preemption language in the federal law. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–53 (1982). Preemption by implication includes field preemption and conflict preemption. *See id.* at 153; *Altria Grp.,* 555 U.S. at 76–77. Field preemption occurs where Congress makes the "decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012). Conflict preemption occurs "where Congress has not completely displaced state regulation in a specific area" but "state law is nullified to the extent that it actually conflicts with federal law." *de la Cuesta,* 458 U.S. at 153.

¶33 Neither express preemption nor field preemption applies to the Upper Compact. The Upper Compact contains no explicit language preempting state law. And article XV(b) precludes any notion of field preemption because it states, "The provisions of this Compact shall not apply to or interfere with the right or power of any signatory State to regulate within its boundaries the appropriation, use and control of water." UPPER COMPACT art. XV(b).

¶34 That leaves us with conflict preemption, which occurs "where it is impossible . . . to comply with both state and federal requirements." *PLIVA, Inc. v. Mensing,* 564 U.S. 604, 618 (2011) (cleaned up). State law may also be preempted when it presents "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal [law] as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373 (2000).

¶35 "Interstate compacts are construed as contracts under the principles of contract law." *Tarrant Reg'l Water Dist. v. Herrmann* 569 U.S. 614, 628 (2013). Just as we would with any other contract, "we begin by examining the express terms of the Compact as the

best indication of the intent of the parties." *Id.* But an interstate compact is somewhat unique in that it "is not just a contract; it is a federal statute enacted by Congress." *Alabama v. North Carolina*, 560 U.S. 330, 351 (2010). When interpreting a federal statute, the court interprets the language "according to its ordinary, contemporary, common meaning. To discern that ordinary meaning, [the] words must be read and interpreted in their context, not in isolation." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (cleaned up).

¶36 Water Horse's conflict preemption argument relies on article IX(a) of the Upper Compact, which states in relevant part, "no State shall deny the right of another signatory State, any person, or entity of any signatory State to acquire rights to the use of water . . . or regulating water in an upper signatory State for consumptive use in a lower signatory State, when such use is within the apportionment to such lower State made by this Compact." UPPER COMPACT art. IX(a). Water Horse maintains that it meets all of the "requirements" of article IX(a). It is a limited liability company formed under the laws of Colorado. Given the proposed point of diversion, Colorado is the upstream location making Colorado "the lower signatory state in relation to Utah." And the proposed amount of diverted water is within Colorado's unused Upper Compact allocation. As such, Water Horse maintains that it "has the unambiguous right to enter Utah to divert a portion of Colorado's allocation under the Upper Basin Compact for use in Colorado." Water Horse argues that its compliance with the express terms of article IX(a) "prohibits the Utah State Engineer from denying the [a]pplication" and that the district court's "ruling and order violate[s] the Upper Basin Compact."

¶37 In essence, Water Horse argues that the Upper Compact implicitly preempts the Export Statute because it is impossible to comply with both. Specifically, Water Horse claims that the Upper Compact required the state engineer to approve its application, even if the Export Statute required the state engineer to reject it. To assess this argument, we must address whether Water Horse's interpretation of article IX(a) is correct.

¶38 The text of article IX(a) states in relevant part "no State shall deny the right of another signatory State, any person, or entity of any signatory State *to acquire rights to the use of water* . . . ." UPPER COMPACT art. IX(a) (emphasis added). Under Water Horse's interpretation, all that it needed to do "to acquire rights to the use of water" in Utah is file the appropriate application with the state

engineer. *Id.* From there, the state engineer is prohibited "from denying the [a]pplication." We disagree with Water Horse's interpretation. Under Water Horse's reading, article IX(a) would not only protect a right "*to acquire* rights to the use of water" but would go further to guarantee a water right to anyone who applied. *Id.* (emphasis added). But that is not what the plain text of the Upper Compact says.

¶39 There is a difference between a right "to acquire rights to the use of water," and the "right to use water." "Acquire" is defined as "gain[ing] possession or control of," *Acquire*, BLACK'S LAW DICTIONARY (12th ed. 2024), often "by one's own efforts or actions," *Acquire*, COLLINS ENGLISH DICTIONARY**,** https://www.collinsdictionary.com/us/dictionary/english/acquire (last visited Oct. 13, 2025). Thus, "acquiring a right" connotes a process whereby one "gains possession or control of" a right they do not otherwise have. *See Acquired Right*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "acquired right" as "[a] right that a person does not naturally enjoy, but that is instead procured"). By protecting the "right to acquire rights to the use of water" we read the Upper Compact as guaranteeing the opportunity to gain possession and control of a right to use water, rather than granting a right to use the water.

¶40 Based on this plain text reading, there is nothing that indicates to us that it is impossible to comply with the terms of both article IX(a) and the Export Statute. Denial of an application for failure to comply with the Export Statute does not mean that Utah has prevented Water Horse from exercising the "right to acquire rights to the use of water." Rather, the Export Statute is a statutorily defined process whereby Water Horse can exercise its right to acquire rights to use water. A right to acquire a right to the use of water does not mean that Water Horse is guaranteed the acquisition of the right to use. Thus, Water Horse's argument that the Upper Compact prohibits the state engineer from denying an application is not supported by the plain text of the compact.

¶41 Still, Water Horse relies on *Tarrant Regional Water District v. Herrmann*, 569 U.S. 614 (2013), to argue that the Upper Compact grants it an "unambiguous right to enter Utah to divert a portion of Colorado's [Upper Compact] allocation." Water Horse contends that *Tarrant* is the "only U.S. Supreme Court decision interpreting article IX(a) of the Upper Basin Compact" and that based on the Supreme Court's interpretation of that provision, "the Utah State

Engineer may not apply the state's water export statute to deny the Application." We disagree with Water Horse's interpretation and application of *Tarrant*.

¶42 In *Tarrant*, the Supreme Court faced the question of whether the Red River Compact preempted Oklahoma law that restricted out-of-state diversions of water. 569 U.S. at 624–26. The plaintiff, Tarrant Regional Water District, was a Texas state entity responsible for providing water to areas of north-central Texas. *Id.* at 624. To meet increasing water demands, Tarrant sought a permit from the Oklahoma Water Resources Board to divert a large quantity of water from a tributary of the Red River. *Id.* at 624–25. Tarrant, however, was aware that Oklahoma's water statutes had been interpreted and applied in such a manner as to effectively preclude an out-of-state party from obtaining a permit to divert water out of the state. *Id.* at 625–26. Tarrant sought to enjoin application of Oklahoma's water statutes, arguing in part that they were preempted by the Red River Compact and that under that same compact, Tarrant had the right to cross state lines and divert water from Oklahoma. *Id.* at 626.

¶43 The Court ultimately ruled against Tarrant. The Court's holding was based in part on the fact that the Red River Compact did not contain a provision that allowed cross-border water diversions. *Id.* at 633–34. The Court noted that, unlike the Red River Compact, many interstate "compacts feature language that unambiguously permits signatory States to cross each other's borders to fulfill obligations under the compacts." *Id.* at 633. The Court then cited a series of interstate compacts and quoted their relevant provisions. *Id.* at 633 & n.12. Among these was a citation to article IX(a) of the Upper Compact. *Id.* From this passing reference, Water Horse extrapolates that the Supreme Court has interpreted article IX(a) in a way that gives Water Horse "the unambiguous right to enter Utah to divert a portion of Colorado's allocation under the Upper Basin Compact."

¶44 But the Supreme Court in *Tarrant* did not interpret the Upper Compact. It merely contrasted the Red River Compact's silence on cross-state diversions with other interstate compacts that expressly contemplate such diversions. And the Court recognized that "many of these compacts provide for the terms and mechanics of how such cross-border relationships will operate" and cited several examples. *Id.* at 634. The Upper Compact does not contain any such provisions as to how the signatory states are to provide

for cross-border water diversions, other than article XV(b), which expressly states that "[t]he provisions of this Compact shall not apply to or interfere with the right or power of any signatory State to regulate within its boundaries the appropriation, use and control of water, the consumptive use of which is apportioned and available to such State by this Compact." UPPER COMPACT art. XV(b).

¶45 We do not read *Tarrant* as suggesting that a signatory state to any of the interstate compacts that grant cross-border water diversions cited in the opinion has necessarily forfeited its sovereign authority to manage waters within its territorial boundaries. As the Court noted, "States do not easily cede their sovereign powers, including their control over waters within their own territories." *Tarrant*, 569 U.S at 631. While article IX(a) of the Upper Compact contemplates cross-border water diversions, the signatory states retained their sovereign authority to manage the water within their territorial boundaries by adopting article XV(b). Under article XV(b), the signatory states retain the authority to define the mechanism for acquiring a water right, and Utah has provided the right to acquire rights to the use of water under article IX via the Export Statute. Because the Upper Compact contemplates that each state will regulate the appropriation of water within its boundaries, it does not preempt the Export Statute.

¶46 Nor does the Export Statute present "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. The Upper Compact outlines its purposes and objectives, which include "to provide for the equitable division and apportionment of the use of the waters of the Colorado River System," "to promote interstate comity," and "to remove causes of present and future controversies." UPPER COMPACT art. I(a). In addition to these objectives, the Upper Compact provides that "[b]eneficial use is the basis, the measure and the limit of the right to use." *Id.* art. III(b)(2).

¶47 Utah's Export Statute sets out the specific requirements an appropriator must meet to obtain approval from the state engineer to export water. The statute provides that the state engineer must approve an application if she finds that the proposed appropriation:

> (A) satisfies Section 73-3-3, 73-3-5.5, or 73-3-8, whichever is applicable; (B) is consistent with Utah's reasonable water conservation policies or objectives;

(C) is not contrary to the public welfare; and (D) does not impair the ability of the state of Utah to comply with its obligation under any interstate compact or judicial decree which apportions water among Utah and other states.

UTAH CODE § 73-3a-108(1)(b)(i). The state engineer must also find that "the water can be transported, measured, delivered, and beneficially used in the recipient state." *Id.* § 73-3a-108(1)(b)(ii).

¶48 The Export Statute does not impede the congressionally ratified purpose of the Upper Compact; it furthers it. The Upper Compact makes "[b]eneficial use . . . the basis, the measure and the limit of the right to use," UPPER COMPACT art. III(b)(2), as does the Utah Code, *see* UTAH CODE § 73-1-3. By expressly requiring that an applicant show beneficial use as a prerequisite to apportioning water for use in another state, the Export Statute ensures that the approval of a cross-border water diversion complies with a central tenet of the Upper Compact. The Export Statute also ensures that in approving an export application, Utah complies with other interstate compact obligations. *See id.* § 73-3a-108(1)(b)(i)(D).

¶49 Simply because Water Horse's application was denied via the statutorily defined process for acquiring a water right, does not mean that the purposes of article IX were thwarted. The Upper Compact only prohibits a state from denying the right to acquire rights to the use of water; it does not guarantee that an applicant will acquire the particular right it seeks. An applicant's ability to apply for an export appropriation under the Export Statute affords the "right to acquire."

¶50 In sum, nothing in the Export Statute makes it impossible to comply with both the Upper Compact and the Export Statute. Rather than presenting an obstacle to the stated purposes of the Upper Compact, the Export Statute facilitates Utah's article IX(a) obligations. Accordingly, the Export Statute is not preempted, and the district court did not err in applying it to Water Horse's export application.

II. WATER HORSE HAS NOT SATISFIED THE CRITERIA OF THE EXPORT STATUTE

¶51 Having concluded that the Upper Compact does not preempt application of the Export Statute, we address whether Water Horse has complied with the Export Statute's requirements. We conclude that it has not. We first apply the terms of the statute

to Water Horse's application, relying on the undisputed facts determined by the district court. We next address Water Horse's remaining arguments as to why it has either satisfied the demands of the Export Statute or why it cannot do so at this stage. We ultimately conclude that none of these arguments alter our conclusion that Water Horse has failed to satisfy the necessary criteria to obtain an export appropriation under the Export Statute.

*A. Water Horse's Application Does Not Establish a Reason to Believe that the Water Can Be Beneficially Used in Colorado*

¶52 To obtain an export appropriation, an applicant must satisfy the criteria listed in section 73-3a-108(1)(b) of the Export Statute. If an applicant fails to meet any of the criteria, the application "shall be rejected." UTAH CODE § 73-3a-108(3). The district court determined that two of those criteria were not met. The first criterion addressed by the district court requires the applicant to show that "the water can be transported, measured, delivered, and beneficially used in the recipient state." *Id.* § 73-3a-108(1)(b)(ii). The second requires the proposed appropriation to satisfy the applicable provision of the Appropriation Statute. *Id.* § 73-3a-108(1)(b)(i)(A). The provision applicable to Water Horse's application requires the state engineer to determine whether "there is reason to believe that . . . the application was filed in good faith and not for purposes of speculation or monopoly." *Id.* § 73-3-8(1)(a)(v).

¶53 We address only the first criterion regarding beneficial use and conclude that Water Horse has not shown a reason to believe that the water can be beneficially used in the recipient state. Because we affirm on this basis, we decline to reach the issue of whether the application is speculative.

¶54 The Export Statute does not expressly provide a standard of proof by which the state engineer must judge an export application. *See generally id.* § 73-3a-108. But both parties agree that the "reason to believe" standard expressly set forth in the Appropriation Statute applies to the Export Statute as well. For purposes of this case then, we will assume, without deciding, that the reason to believe standard applies.

¶55 Although the reason to believe standard is a relatively low bar, we have refrained from lowering it so far as to "turn the state engineer into nothing more than a rubber stamp" in assessing applications. *Searle v. Milburn Irrigation Co.*, 2006 UT 16, ¶ 45, 133 P.3d 382. Rather, "the application process must provide some

meaningful barrier so that the floodgates remain closed to all applications except those with a sufficient probability of successful perfection." *Id.* "Before application approval is warranted, it must be clear that the decisionmaker's determination that there is reason to believe" that a particular requirement has been met "is grounded in evidence sufficient to make that belief reasonable." *Id.* ¶ 46. Applying that standard, we conclude that Water Horse has not met its burden to show that there is a reason to believe that the water it seeks to divert from the Green River can be "beneficially used in the recipient state" of Colorado.

¶56 The district court ruled that Water Horse "failed to offer material facts which establish the statutory requirements" of the Export Statute because "[t]he showing of beneficial use will necessarily require a Colorado water court decree," which Water Horse does not have. In reaching that conclusion, the court did "not delve deeply into the aspects of Colorado law on the subject" but rather relied on the state engineer's "citations to Colorado water [law] and the outlined requirements."

¶57 We agree with the district court that, based on the factual record, Water Horse failed to show that there is a reason to believe that the water it seeks to divert can be put to beneficial use in Colorado. We again turn to several key undisputed facts as articulated by the district court:

- "To date, Water Horse has not filed an application or action of any kind with any Colorado agency or water court for approval for its proposed appropriation or Project."

- "Water Horse has not obtained any approvals from Colorado for the proposed appropriation or Project."

- "Water Horse has not asked the Upper Colorado Commission or the State of Colorado that the appropriation be counted against Colorado's Upper Compact allocation."

- "The State of Colorado and Upper Colorado River Commission have not agreed to account for depletions from the Project under Colorado's Colorado River allocation."

¶58 Based on these facts we find it difficult to form any level of belief, let alone a reasonable one, that Water Horse can put the water to beneficial use in Colorado. Water Horse argues that Utah should grant the export appropriation and then Water Horse will go to Colorado and find a way to put the water to beneficial use. But this is not what the Export Statute requires. Water Horse must

establish a reason to believe that the water "can be . . . beneficially used" in Colorado as a prerequisite to approval. *See* UTAH CODE § 73-3a-108(1)(b)(ii), (3). Water Horse's claim that it will be able to put the water to beneficial use is not established by any evidence—circumstantial or direct—showing that once the water leaves Utah and enters Colorado, it can be used as Water Horse intends. Water Horse has not established that it can use the water by operation of law or by virtue of a judicial decree or some form of administrative approval.

¶59 Water Horse contends that a "Utah permit . . . is but the first step in a long process to bring its diversion from the Green River to fruition." For example, Water Horse explains that it will need various approvals or permits from the U.S. Bureau of Land Management, the U.S. Army Corps of Engineers, and U.S. Fish and Wildlife Service. It will also need various local permits and to acquire various property rights. As such, Water Horse argues that it "need not have all those permits and acquisitions in place for the [a]pplication to be granted." It contends that the reason to believe standard is low enough that an applicant need not dot every i and cross every t prior to obtaining approval.

¶60 But the record shows that Water Horse has not dotted any i's or crossed any t's. There is no evidence that Water Horse has obtained any permits or acquisitions or that it is in the process of obtaining them. The reason to believe standard may be low, but it is not so low that an applicant can present a "we'll figure it out as we go" proposal and obtain an appropriation. Approving an export application on such a proposal would indeed "turn the state engineer into nothing more than a rubber stamp," *Searle*, 2006 UT 16, ¶ 45, and would frustrate the purpose of the Export Statute—and the Upper Compact—in ensuring that water is put to beneficial use.

¶61 Water Horse counters that it does not need Colorado's approval to put the water to beneficial use. It goes so far as to say that "Colorado does not require a [water rights] decree; anyone can beneficially use Colorado's water (including its [Upper] Compact apportionment)." But Colorado's water officials suggest otherwise. According to those officials, Water Horse "must comply *with relevant laws and procedures for water rights administration in Colorado*." (Emphasis added.) They also stated that "Colorado maintains that water from the Upper Colorado River Basin shall not be considered or accounted for as part of Colorado's compact

apportionment unless and until *proceedings for placing water to beneficial use in Colorado have been followed and completed*." (Emphasis added.)

¶62 While Water Horse's motion for reconsideration was pending before Utah's state engineer, Colorado's state engineer reiterated this position in communications with Water Horse. He explained that Water Horse would need to "complete[] a proceeding in Colorado confirming a water right for the claimed beneficial use," which would "provide additional information regarding the nature of the appropriation to the [Colorado] State Engineer's Office as to beneficial use and accounting for such depletion as part of Colorado's apportionment." He also explained that "any required proceedings for placing water to beneficial use in Colorado will likely depend on the detailed plans for the delivery of water for specific beneficial uses."

¶63 Even if these officials are wrong and Water Horse can put the water to beneficial use by mere operation of law, it has not made that showing. Assuming there is a process, Water Horse has failed to explain what that process entails and, more importantly, why it cannot be pursued at this stage. The undisputed facts establish that Water Horse has not attempted to engage in any kind of process—judicial, administrative, or otherwise—that would allow it to show that it can beneficially use the water in Colorado. Given the record before us the district court correctly concluded that the state engineer had no reason to believe that the water can be beneficially used in Colorado.

### B. *Water Horse's Other Arguments Are Unavailing*

¶64 Water Horse advances several arguments as to why the requirement that it show beneficial use in Colorado should not prevent it from obtaining approval for the export application. We address each in turn and ultimately determine that none of these arguments convince us to reach a different conclusion.

#### 1. Jurisdiction of Colorado Water Courts

¶65 Water Horse contends that the district court erred in ruling that Water Horse "must first obtain a decreed water right from a Colorado water court before proceeding in Utah." Water Horse relies on *West End Irrigation Co. v. Garvey*, 184 P.2d 476 (Colo. 1947), and argues that "no Colorado court has jurisdiction to grant a water rights decree where the point of diversion is outside Colorado's boundaries."

¶66   In *West End*, the Colorado Supreme Court reviewed a trial court's ruling that recognized a Colorado decree granting a right to divert water in Utah for use in Colorado. *Id.* at 477–78. The Colorado Supreme Court reversed and held that under state law then in effect, a Colorado court had jurisdiction only to determine "priority of appropriations between ditches drawing water from the same stream or its tributaries within the same water district." *Id.* at 478 (cleaned up). Water Horse takes this to mean that it cannot obtain a water rights decree from a Colorado water court because a Colorado water court does not have "jurisdiction outside Colorado."

¶67   But whether a Colorado water court lacks jurisdiction to adjudicate a point of diversion does not bear on whether Water Horse can show that it can beneficially use the water in Colorado. The Utah state engineer has never suggested that Colorado has authority to grant Water Horse permission to divert water in Utah. Instead, she maintains only that Water Horse "must first have a Colorado right to use water within" Colorado "before Utah can grant its application to divert water from a Utah diversion point." For Water Horse's jurisdictional argument to merit further consideration, Water Horse would need to show that a Colorado water court does not have jurisdiction to adjudicate whether Water Horse can put the water to beneficial use in Colorado prior to obtaining approval from the Utah state engineer to divert the water. But Water Horse does not provide any controlling authority to that effect.

¶68   The undisputed facts also show that Water Horse has not gone to a Colorado water court, nor has it sought an answer to whether Colorado water courts have jurisdiction to adjudicate the issue of beneficial use prior to Water Horse obtaining Utah's approval to export the water. Because Water Horse has not shown that a Colorado water court cannot adjudicate the issue of beneficial use before an export application is filed with the Utah state engineer, the district court did not err in concluding that Water Horse had not met the requirement to show that the water can be beneficially used in Colorado.[7]

---

[7] Water Horse also contends that the district court improperly applied principles of interstate comity due to a "misunderstanding of Colorado water courts." "Comity is a principle under which the

(continued . . .)

### 2. Order of Operations

¶69 Water Horse's next argument involves the order of operations for obtaining approvals for its proposed project. Water Horse frames the issue as a classic catch-22. Water Horse contends that without an export appropriation from Utah, Water Horse will not be able to get any kind of approval from Colorado. We appreciate that Water Horse could face some administrative or procedural difficulty in this regard. But because Water Horse has not tried to initiate any form of proceeding in Colorado, its concern is merely hypothetical. And whatever merit Water Horse's argument may have, we will not speculate about what Colorado can and cannot do under the application of its own law. Hypothetical hurdles do not constitute sufficient grounds for us to reverse the district court's ruling.

### 3. Use of Colorado's Upper Compact Allotment

¶70 Water Horse next argues that the exported water will be counted as part of Colorado's Upper Compact allocation because "[t]he place of beneficial use determines the state allocation." There are at least two problems with this argument. First, Water Horse's contention has been directly refuted on at least two separate occasions by Colorado water officials. Those communications suggest that a private entity cannot use or account for a portion of Colorado's Upper Compact allotment without some form of approval from the state of Colorado—whether judicial or administrative. This comports with article XV(b) of the Upper Compact under which the signatory states retain the right to manage the water resources within their boundaries.

¶71 Second, even if we assume that Water Horse's statement is correct, it does not answer the question of whether Water Horse can put the water to beneficial use in Colorado. Simply because a

---

courts of one state give effect to the laws of another state . . . ." *Trillium USA, Inc. v. Bd. of Cnty. Comm'rs*, 2001 UT 101, ¶ 19, 37 P.3d 1093 (cleaned up). Water Horse contends that "dismissing this case under the guise of 'comity' would do nothing to 'give effect to the laws' of Colorado." (Quoting *Trillium USA*, 2001 UT 101, ¶ 19.) But as the state engineer points out, the court's decision "was based on its application of Utah law, not principles of comity." And as explained, Water Horse has not persuaded us that it cannot adjudicate its case before a Colorado water court (or engage in some other adjudicative process required in Colorado) at this stage.

portion of Colorado's Upper Compact allocation might be available does not establish that Water Horse can beneficially use it. In the absence of any evidence establishing that Water Horse can beneficially use the water, the district court correctly declined to disturb the state engineer's decision.

### 4. Conditional Application Approval

¶72 Water Horse finally argues that the state engineer can grant a conditional export appropriation "that is based on terms and conditions [and] that is a first step toward finalizing an appropriation." Water Horse proposes that "such terms and conditions can provide assurances that the appropriation will be beneficially used in Colorado and charged against Colorado's Compact apportionment." The Export Statute does allow the state engineer to approve a conditional export appropriation, but not in the way Water Horse argues. *See* UTAH CODE § 73-3a-108(4).

¶73 The Export Statute provides: "The state engineer may condition any approval to ensure that the use of the water in another state: (a) is subject to the same laws, rules, and controls that may be imposed upon water use within the state of Utah; or (b) is consistent with the terms and conditions of any applicable interstate compact to which the state of Utah is a party." *Id.* Nothing in the statute indicates that the state engineer can grant an export appropriation on conditions other than these two statutorily defined conditions.

¶74 Neither subsection 73-3a-108(4)(a) nor (4)(b) provides for approval conditioned on the applicant showing beneficial use after obtaining the appropriation. And subsection 73-3a-108(3) states that if the application "fails to meet any criteria of Subsection (1), it shall be rejected." Thus, each criterion listed in subsection 73-3a-108(1)(b)—including that "the water can be transported, measured, delivered, and beneficially used in the recipient state" is mandatory and the applicant must meet each of them as a prerequisite to approval. *Id.* § 73-3a-108(1)(b)(ii). Therefore, the state engineer cannot grant Water Horse an export appropriation on condition that "the appropriation will be beneficially used in Colorado" because Water Horse is obligated to meet that requirement before obtaining approval. If it cannot make that showing prior to approval, then its application must be rejected. *See id.* § 73-3a-108(3). The district court ruled accordingly.

## CONCLUSION

¶75  This case invited us to interpret and apply various aspects of the Law of the River. Lurking beneath the water's surface, so to speak, were various issues of federalism, state sovereignty, state water law, and administrative processes. But our resolution is straightforward. We hold that (1) the Upper Compact does not preempt the application of Utah's Export Statute and (2) Water Horse failed to establish a reason to believe that the exported water can be put to beneficial use in Colorado as required by the Export Statute. For those reasons, the district court correctly declined to disturb the state engineer's decision. We affirm.

––––––––––––